Elizabeth B. DUNCAN, et al.,
Plaintiffs-Appellees,

v.

David B. POYTHRESS, et al.,
Defendants-Appellants.

No. 81–7363.

United States Court of Appeals,
Fifth Circuit.
Unit B

Sept. 28, 1981.

Rehearing and Rehearing En Banc
Denied Nov. 13, 1981.

Michael J. Bowers, Senior Asst. Atty. Gen., Patrick W. McKee, Asst. Atty. Gen., Don A. Langham, 1st Asst. Atty. Gen., Hamilton Lokey, Atlanta, Ga., for defendants-appellants.

William B. Hollberg, William F. Rucker, Atlanta, Ga., for plaintiffs-appellees.

Before FRANK M. JOHNSON, Jr. and HATCHETT, Circuit Judges, and SCOTT *, District Judge.

HATCHETT, Circuit Judge:

In this appeal we review a decision of the district court holding that Georgia's special election statute, Ga.Code § 34–1514, requires the selection of a successor for a resigning member of the Georgia Supreme Court by means of a popular election. The district court committed no abuse of discretion in refusing to abstain from hearing this section 1983 civil rights action. 42 U.S.C.

* District Judge of the Middle District of Florida, sitting by designation.

§ 1983. We agree with its conclusion that the due process clause of the fourteenth amendment to the United States Constitution protects against the disenfranchisement of a state electorate in violation of state election law. We also concur in the district court's conclusion that Georgia Code section 34–1514 mandates the calling of a special election under the circumstances of this case. We therefore affirm the decision of the district court, 515 F.Supp. 327, to order the calling of a special election to fill the vacancy on the Georgia Supreme Court created by the resignation of Justice Jesse G. Bowles.

## BACKGROUND

Several registered voters of Georgia brought this action in district court claiming that the refusal of state officials to call a special election to fill a position on the Georgia Supreme Court violated their constitutionally protected right to vote. The voters named as defendants George D. Busbee, the Governor of Georgia; Jesse G. Bowles, a former associate justice of the Georgia Supreme Court whose resignation triggered the events leading up to this suit; Hardy Gregory, Jr., an associate justice appointed by Governor Busbee to replace Justice Bowles on the supreme court; and David B. Poythress, the Georgia Secretary of State with responsibility for the calling of special elections for positions on the Georgia Supreme Court.[1] The Georgia Constitution provides for the popular election of justices on the state's highest court, Ga.Const. art. 6, § 2, ¶ 3, and state law provides that "whenever any person elected to public office shall . . . withdraw prior to taking office . . . then [state officials] shall thereupon call a special . . . election to fill such position." Ga.Code § 34–1514.[2]

Justice Bowles held a term of office as an associate justice which ended on December 31, 1980. On November 4, 1980, he was re-elected to the Georgia Supreme Court for a six-year term to begin on January 1, 1981. On November 20, 1980, however, he wrote a letter of resignation to Governor Busbee stating that his resignation would be effective on December 31, 1980. The governor accepted this resignation by letter dated November 21, 1980.

On December 15, 1980, Justice Bowles took the oath of office for the new term of office scheduled to begin on the first day of 1981. On January 5, 1981, his first day in office during the new term, Justice Bowles sent a second letter of resignation to the governor. The governor accepted this resignation on the same day. Three days later, on January 8, the governor swore in Hardy Gregory, Jr., as a replacement for Justice Bowles on the Georgia Supreme Court.

The circumstances surrounding this unusual sequence of events have been described in great detail in the carefully written opinion of the district court. The record fully supports the district court's description of the attempts by Georgia officials to fill the judicial vacancy through executive appointment. The district court also described the efforts of the voters who brought this suit to assure the calling of a special election. We attach as an appendix that portion of the district court's opinion describing the underlying circumstances of this case. To address the points raised on appeal, however, we need focus only upon three of the district court's findings of fact. Though disputed on appeal by the Georgia officials, each of these findings is well supported by the record and is affirmed in this

---

1. Defendants Gregory and Poythress were joined in this action solely for the purpose of affording the voters complete relief. They were not implicated in the actions which gave rise to the voters' complaint.

2. Georgia's special election statute, Ga.Code § 34–1514, provides in full:
 Whenever any primary or election shall fail to fill a particular nomination or office and

such failure cannot be cured by a run-off primary or election, or whenever any person elected to public office shall die or withdraw prior to taking office, or whenever any person elected to public office shall fail validly to take that office, then the authority, with whom the candidates for such nomination or office filed their notice of candidacy, shall thereupon call a special primary or election to fill such position.

appeal for reasons discussed in the final portion of this opinion.

First, the district court found that Justice Bowles intended to vacate both the term he was then serving and the upcoming term to which he had been elected when he delivered his first letter of resignation on November 20, 1980. The court stated that the contention of the Georgia officials that Justice Bowles intended to resign only from his current term is "neither logical nor, when viewed in light of all the evidence, credible." In reaching this conclusion, the district court emphasized that

[w]hile it is unusual for any public official who intends to continue holding office to submit a letter of resignation, it is extremely odd, as the defendants concede, for a resignation allegedly applicable only to that official's current term to be effective on the day that term would naturally expire as a matter of law. On the other hand, an official who intends to give up his office altogether might very well make his resignation effective on the last day of his present term since that is a logical and convenient termination date.

The district court also noted that Justice Bowles took no steps to correct the widespread public impression that he would be leaving office forever on the last day of 1980. Justice Bowles never asked the governor to halt the search for his successor begun by the state's Judicial Nominating Commission in early December. As the district court stated:

[A]lthough the defendants testified that on the morning of January 5, 1981, Justice Bowles had not yet decided to resign, Governor Busbee had no knowledge of his imminent resignation, and Hardy Gregory had not had contact with the Governor since his December interview, Justice Bowles called Gregory, his replacement, that morning to discuss the transition.

Second, the district court found that the Georgia officials understood and responded to Justice Bowles's November resignation letter as a decision to leave the court permanently on the last day of his current term. The governor did not accept this

resignation letter in the belief that it represented just a one-day resignation. Instead, the governor, Justice Bowles, Charles Tidwell (the governor's executive counsel in charge of judicial nominations), and the members of the Georgia Judicial Nominating Commission, all acted with the intention and expectation of replacing Justice Bowles through executive appointment. As noted by the district court:

The Governor, Justice Bowles, and Charles Tidwell considered and discussed the timing of the justice's impending resignation at meetings in the Fall of 1980. With the aid of the Governor's office, Bowles timed his resignation expressly to assist the Commission and the Governor in choosing his successor. The Governor's office initiated the Commission's search for Bowles' replacement, interviewed candidates, and apparently chose his successor before Bowles' second resignation was tendered on January 5, 1981. After the plaintiffs initiated their efforts, Busbee and Tidwell familiarized themselves with and discussed the special election statute at a meeting on November 24, 1980. The Governor subsequently stated at his December 4, 1980, press conference that he did not favor a special election to fill Justice Bowles' seat on the Supreme Court because of the cost involved and the probable low voter turnout . . . .

Third, the district court found that Justice Bowles did not intend to rescind his resignation by taking the oath of office for the upcoming term on December 15, 1980, and by briefly entering upon the duties of that office on January 5, 1981. Very little evidence was presented to indicate that Justice Bowles intended to rescind his earlier withdrawal, or that the governor consented to that rescission. In view of the ongoing search for Justice Bowles's successor, the district court found that his "taking the oath of office for his new term is more logically seen as an effort to ensure the appointment of his successor than as a genuine reconsideration of his decision to leave the court."

In sum, the district court found that on November 20, 1980, Justice Bowles intended to resign permanently from the Georgia Supreme Court as of the last day of the term he was then serving. On November 21, 1980, the governor accepted this permanent resignation. The district court further found that throughout the following weeks there was no change in Bowles's intention to leave the court, or in the Governor's intention to select his successor.

Shortly after Justice Bowles sent his second resignation letter and Hardy Gregory was sworn in as his successor, several voters brought this action seeking the following equitable relief: a declaration that the refusal of Georgia officials to call a special election violated their rights of suffrage under the state and federal constitutions; an order requiring the calling of a special election so that the Georgia electorate could choose a successor for Justice Bowles; an order enjoining Justice Gregory from further service on the Georgia Supreme Court; and an order enjoining Justice Gregory from running in the requested special election as an incumbent. The voters sought damages in the amount of one dollar each as nominal compensation for the denial of their right to vote. They also sought one million dollars in punitive damages from defendants Busbee and Bowles for financing of the special election.

The Georgia officials responded with three principal arguments. First, they asked the district court to apply the doctrine established in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and abstain from hearing this case. Second, they argued that even if they violated the provisions of Georgia's special election statute, such a violation does not give rise to a constitutional claim. Third, they offered an interpretation of the facts in this case and the election laws of Georgia seeking to show that Georgia's special election statute, Ga.Code § 34–1514, does not apply to this case.

The district court decided that *Pullman* abstention is inappropriate in this case because the special election statute lacks the ambiguity required under the *Pullman* doctrine. The district court then held that the due process clause of the fourteenth amendment offers protection against the disenfranchisement of an entire state electorate through the refusal of public officials to call a special election as required by law. Finally, the district court rejected various arguments offered to show that Georgia's special election statute permits the selection of Justice Bowles's successor through gubernatorial appointment rather than popular election. The court therefore declared that the Georgia electorate had been deprived of a constitutionally protected right to vote.

The district court ordered the calling of a special election to choose Justice Bowles's successor, and it enjoined Justice Gregory from running in this election as an incumbent. The court declined, however, to enjoin Justice Gregory from further service on the court, holding that his swearing in by the governor "vested Justice Gregory with de facto authority to act as an Associate Justice both prior and subsequent to this judgment." The court awarded the voters one dollar each as nominal damages, but declined to award punitive damages since it found that the Georgia officials lacked the requisite malice. The district court also granted attorney's fees to the voters under the Civil Rights Attorney's Fees Award Act. 42 U.S.C. § 1988. Since it found that state law claims overlapped with the federal claims, the district court found no reason to reach pendent state law claims. The district court likewise found it unnecessary to grant the voters relief under the equal protection clause of the fourteenth amendment since the court found that they could secure redress through its due process guarantees.[3]

A Fifth Circuit panel stayed the district court's order pending disposition of this appeal.

---

**3.** Because we agree with the rationale, as well as the decision, of the district court, we too have no occasion to reach the claims of the voters which are based on either state law or the equal protection clause of the fourteenth amendment.

## ISSUES

Since the Georgia officials have renewed their principal arguments on appeal, we must resolve three issues: (1) whether the district court abused its discretion in declining to invoke *Pullman* abstention; (2) whether the Georgia special election statute, Ga.Code § 34–1514, requires the Georgia officials to call a special election; and (3) whether the due process clause of the fourteenth amendment offers any protection to state citizens if state officials refuse to call an election as required by state law.

## ABSTENTION

▮ We begin by addressing the contention of the Georgia officials that the district court should have refused to hear this case because of the principles of abstention set forth by the Supreme Court in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The *Pullman* doctrine authorizes abstention when a federal court faces a constitutional challenge which is intertwined with an ambiguous issue of state law and there is a likelihood that clarification of the state law will moot or substantially alter the federal question. *See Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980); *Gibson v. Jackson*, 578 F.2d 1045, 1048 (5th Cir. 1978), *cert. denied*, 439 U.S. 1119, 99 S.Ct. 1028, 59 L.Ed.2d 79 (1979).[4]

While ambiguity in a state's law and the likelihood of avoiding constitutional adjudication are both necessary for *Pullman* abstention, they are not always sufficient, since abstention is a matter of "principled discretion not doctrinaire adherence." *Gib-*

*son*, 578 F.2d at 1048. "The abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt*, 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964). In fact, the stay of federal decision is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959) (quoted in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)). The extraordinary nature of abstention stems from the duty of decision imposed by Congress upon the district courts.

Congress could, of course, have routed all federal constitutional questions through the state court systems, saving to [the Supreme] Court the final say when it came to review of the state court judgments. But our First Congress resolved differently and created the federal court system and in time granted the federal courts various heads of jurisdiction, which today involve most federal constitutional rights....

... We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal courts should stay its hand and not decide the question before the state courts decided it.

*Wisconsin v. Constantineau*, 400 U.S. 433, 437–39, 91 S.Ct. 507, 510–11, 27 L.Ed.2d 515

---

4. Federal abstention also presupposes the availability of an alternative state forum which can afford full and fair relief. The Georgia voters do not argue that they lack an effective remedy in the Georgia courts, and it appears that they might be able to bring a mandamus action to force compliance with a law requiring public officials to call a special election. See Ga.Code § 64–101 (a writ of mandamus will lie to compel performance of official duties in the absence of a specific legal remedy); *City of Atlanta v. League of Women Voters of Atlanta-Fulton County, Inc.*, 244 Ga. 796, 262 S.E.2d 77 (1979) (a writ of mandamus will lie to force officials to comply with a law calling for a

special election to fill a municipal office). There is no need to dwell upon this prerequisite to abstention because the voters have likewise avoided any claim that the courts of Georgia are unable to adjudicate impartially their claim of an illegal gubernatorial appointment to the Georgia Supreme Court. We likewise perceive and intimate no reason to doubt the fairness—either in fact or appearance—of adjudication of this case by the courts of Georgia. Cf., *Palmer v. Jackson*, 617 F.2d 424 (5th Cir. 1980) (rejecting *Pullman* abstention despite the asserted absence of an adequate state forum when lower state courts would be called upon to review administrative acts of the state's highest court).

(1971) (footnotes omitted). *See High Ol'Times, Inc. v. Busbee*, 621 F.2d 135, 139 (5th Cir. 1980); *Johnson v. American Credit Co. of Georgia*, 581 F.2d 526, 530 n. 6 (5th Cir. 1978).

Since abstention is the exception rather than the rule, the Supreme Court has required a finding of "special circumstances" before allowing a district court to deny a federal plaintiff the forum that he has lawfully chosen for the resolution of his constitutional claims. *E. g., Zwickler v. Koota*, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967) (*Pullman* abstention is appropriate only in "narrowly limited 'special circumstances.' "). *See* Wright, *Law of Federal Courts*, § 52, at 220 (3rd ed 1976). ("The Court continues to require 'special circumstances' to justify abstention").

■ An alleged denial of voting rights does not, in itself, constitute a "special circumstance" which automatically precludes federal court abstention. *See, e. g., Harrison v. NAACP*, 360 U.S. 167, 79 S.Ct. 33, 3 L.Ed.2d 53 (1959); *Romero v. Coldwell*, 455 F.2d 1163 (5th Cir. 1972). It is also true, however, that in deciding whether or not to abstain, a federal court "must . . . take into consideration the nature of the controversy and the particular right sought to be enforced." *Edwards v. Sammons*, 437 F.2d 1240, 1243 (5th Cir. 1971) (abstention held inappropriate "based . . . on the imperative of the right to vote"). It therefore appears that "when voting rights, racial equality and First Amendment rights of expression have been at stake the [United States Supreme Court] has been reluctant to abstain." 1A J. Moore Federal Practice ¶ 0.203[1], at 2111–12 (2d ed. 1976). *See e. g., Harman v. Forssenius*, 380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50 (1965) (abstention held inappropriate in view of "the nature of the constitutional deprivation," a denial of the "fundamental right to vote").

■ Just as an alleged denial of voting rights does not preclude federal abstention, so the absence of pending state proceedings does not mandate federal adjudication. Of course, abstention entails piecemeal litiga-

tion and the resulting delay is most acute when a federal plaintiff must initiate state proceedings. While federal courts have often pointed to the presence of a pending state action as one factor supporting abstention, *e. g., Harris County Commissioners Court v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975); *Abell v. Frank*, 625 F.2d 653, 658 (5th Cir. 1980); *Finch v. Mississippi State Medical Association, Inc.*, 585 F.2d 765, 778 (5th Cir. 1978), we have never deemed the lack of pending state proceedings to be a circumstance that necessarily prevents federal abstention. *See Romero v. Coldwell*, 455 F.2d 1163, 1167 (5th Cir. 1972).

■ In summary, the extraordinary decision to stay federal adjudication requires more than an ambiguity in state law and a likelihood of avoiding constitutional adjudication. A district court must carefully assess the totality of circumstances presented by a particular case. This requires a broad inquiry which should include consideration of the rights at stake and the costs of delay pending state court adjudication. Because of the complexity of factors which guide a particular decision on *Pullman* abstention, we have often held that a decision of the district court will be reversed on appeal only upon a showing of an abuse of the discretion entrusted to a trial court. *E. g., Redbluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1032 n. 15 (5th Cir. 1981); *Chancery Clerk of Chickasaw City, Mississippi v. Wallace*, 646 F.2d 151, 154 (5th Cir. 1981); *High Ol'Times*, 621 F.2d at 138–39; *Ross v. Houston Independent School District*, 559 F.2d 937, 943 (5th Cir. 1977); *accord, Harman*, 380 U.S. at 534, 537, 85 S.Ct. at 1181–82 (1965); *see* Wright, *Law of Federal Courts*, § 52, at 224 (3rd ed. 1976).

■ Turning to the case before us, we cannot say that the district court abused its discretion in declining to invoke *Pullman* abstention. The district court recognized that if the Georgia courts should interpret the state's election laws in a manner that validated the appointment of Justice Bowles's successor, then no reason would

exist for the federal courts to decide whether an illegal denial of a special election violates the United States Constitution. Specifically, the district court noted that the Georgia special election statute mandates the calling of an election only when an elected candidate "withdraws" before assuming an office to which he has been elected. Ga.Code § 34–1514. Whether Justice Bowles's November 20, 1980, letter of resignation constituted a "withdrawal" from his upcoming term of office as well as resignation from his current term is a question of state statutory construction. If the state courts should answer this question in the negative, there would be no need for the district court to decide whether the refusal to call a special election in violation of section 34–1514 deprives the Georgia electorate of a constitutionally protected right to vote.

The district court declined to abstain, however, after finding no likelihood of avoiding constitutional questions by sending the Georgia voters to the state courts because the meaning of the special election statute is clear. We agree. The Supreme Court has "frequently emphasized that abstention is not to be ordered unless the state statute is of uncertain nature, and is obviously susceptible of a limiting construction." Zwickler, 389 U.S. at 251 n. 14, 88 S.Ct. at 397 n. 14. We have therefore rejected Pullman abstention in all cases lacking ambiguity in state law. E. g., Chancery Clerk of Chickasaw City, Mississippi v. Wallace, 646 F.2d 151 (5th Cir. 1981); High Ol'Times v. Busbee, 621 F.2d 141 (5th Cir. 1980); Johnson v. American Credit Co. of Georgia, 581 F.2d 526 (5th Cir. 1978).

▮▮▮ The final section of this opinion will explore several asserted limitations upon the scope of Georgia's special election statute, but here we note our agreement with the district court that section 34–1514 simply means what it says: a special election is required when an officeholder withdraws from a future term. Despite creative arguments by the Georgia officials, we can see no reasonable room for interpreting the special election statute in any

manner other than its plain meaning would indicate. A basic canon of statutory construction is that words should be interpreted in accordance with their plain and ordinary meaning unless a clear, contrary legislative intention is shown. United States v. Apfelbaum, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980); United States v. Yeatts, 639 F.2d 1186 (5th Cir. 1981).

The mere fact that this statute has never been interpreted by the state courts does not indicate sufficient ambiguity to justify Pullman abstention. The "mere absence of judicial interpretation does not necessarily render [state law] unsettled or uncertain." B.T. Investment Managers, Inc. v. Lewis, 559 F.2d 950, 954 (5th Cir. 1977). See, e. g., Zablocki v. Redhail, 434 U.S. 374, 379 n. 5, 98 S.Ct. 673, 677 n. 5, 54 L.Ed.2d 618 (1978); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). "Of course, as every attorney knows, any statutory provision can be made ambiguous through a sufficiently assiduous application of legal discrimination." Babbitt v. United Farm Workers National Union, 442 U.S. 289, 315–16, 99 S.Ct. 2301, 2318, 60 L.Ed.2d 895 (1979) (Brennan, J., concurring in part and dissenting in part). Pullman abstention is appropriate, however, only when there is sufficient ambiguity in state law to create a reasonable probability that state courts could eliminate or alter the federal constitutional issue. See, e. g., Zwickler v. Koota, 389 U.S. 241, 251 n. 14, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967) (abstention held inappropriate because state statute was not "obviously susceptible of a limiting construction"); Harrison v. NAACP, 360 U.S. 167, 176–77, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959) (abstention held appropriate because state statute was "fairly open to interpretation" and there was "reasonable room for a construction" by the state courts which would moot or alter the federal issue); Ibarra v. Bexar County Hospital District, 624 F.2d 44, 47 (5th Cir. 1980) (abstention held appropriate when disputed state laws were "sufficiently vague that they reasonably could be interpreted as either party

contends"). We agree with the district court that the statute is so clear that this case offers little hope of avoiding constitutional adjudication by deferring federal decision while the Georgia voters initiate state proceedings.

In addition to the clarity of the Georgia election law, the circumstances surrounding this case further support the district court's refusal to abstain. At issue in this case is nothing less than the fundamental right to vote. The delay inherent in abstention is least tolerable where, as here, fundamental constitutional rights enjoyed by a broad class of citizens would be suspended while adjudication begins in state court. *See, e. g., Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (first amendment rights); *Edwards v. Sammons,* 437 F.2d 1240 (5th Cir. 1971) (voting rights); *Ross v. Houston Independent School District,* 559 F.2d 937 (5th Cir. 1977) (school desegregation rights). The delay inherent in abstention takes a particularly heavy toll when a voting rights challenge raises doubts in the public mind about the legitimacy of officeholders and the governmental bodies on which they serve. *See Edwards v. Sammons,* 437 F.2d 1240 (5th Cir. 1971).

In the voting rights case of *Harman v. Forssenius,* the Supreme Court has pointed to such considerations as independent justifications for the refusal of a district court to abstain:

· In addition to the clarity of [previously uninterpreted state election] statutes, support for the District Court's refusal to stay the proceedings is found in the nature of the constitutional deprivation alleged and the probable consequences of abstaining. The District Court was faced with two class actions attacking a statutory scheme allegedly impairing the right to vote in violation of Art. I, § 2, and the Fourteenth, Seventeenth and Twenty-fourth Amendments. As this Court has stressed on numerous occasions, '[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative

government.' The right is fundamental 'because preservative of all rights.' *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, [1071], 30 L.Ed. 220, 226. In appraising the motion to stay proceedings, the District Court was thus faced with a claimed impairment of the fundamental civil rights of a broad class of citizens. The motion was heard about two months prior to the deadline for meeting the statutory requirements and just eight months before the 1964 general elections. Given the importance and the immediacy of the problem, and the delay inherent in referring questions of state law to state tribunals, it is evident that the District Court did not abuse its discretion in refusing to abstain.

380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50 (1965) (footnotes omitted) (citations omitted). We likewise refuse to find an abuse of discretion in the decision of the district court to determine without delay whether the citizens of Georgia have been denied the right to select for themselves a person to serve on the state's highest court. Since the meaning of the special election statute is clear, and the cost of further delay would be prohibitive, *Pullman* abstention is simply inappropriate in the circumstances of this case.

### CONSTITUTIONAL ISSUES

This case brings before us a question heretofore unanswered in the Fifth Circuit: whether the due process clause of the fourteenth amendment offers protection against those rare, but serious, violations of state election laws that undermine the basic fairness and integrity of the democratic system. Although we recently decided that the fourteenth amendment provides no guarantee against innocent irregularities in the administration of state elections, we were not required to determine when state election practices "may operate so unfairly as to constitute a denial of ... due process ...." *Gamza v. Aguirre,* 619 F.2d 449, 454 n. 6 (5th Cir. 1980) (citing *Griffin v. Burns,* 570 F.2d 1065, 1078–79 (1st Cir. 1978) and *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970)). The approach which we adopted in

*Gamza,* however, and the guidance offered by cases such as *Griffin* and *Briscoe,* point the way to our holding today that the due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process.

The Georgia voters brought this suit under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3). Section 1983 provides a remedy for the deprivation of rights "secured by the Constitution and laws" of the United States by persons acting under color of state law. 42 U.S.C. § 1983.[5] There is no doubt that the Georgia officials were acting under color of state law in filling the judicial vacancy created by Justice Bowles's resignation through gubernatorial appointment rather than through a special election. In a case in which the state action requirement of section 1983 was satisfied, the Supreme Court recently reminded us that "[t]he first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.' " *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). The sufficiency of the voters' complaint therefore turns on whether the state officials violated the Georgia special election statute, Ga. Code § 34–1514, and if so, whether this constitutes a deprivation of federally protected rights. In this section of the opinion, we consider the state officials' argument that even if the appointment illegally disenfranchised the Georgia electorate, this violation of state law does not rise to the level of a constitutional deprivation.

■■■ "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims,* 377 U.S. 533, 554, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1964). Qualified citizens not only have a constitutionally protected right

to vote, *Ex parte Yarbrough,* 110 U.S. 651, 45 S.Ct. 152, 28 L.Ed. 274 (1884), but also the right to have their votes counted, *United States v. Mosley,* 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915), a right which can neither be denied outright, *Lane v. Wilson,* 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939), nor destroyed by alteration of ballots, *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), nor diluted by ballot box stuffing, *United States v. Saylor,* 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944). The reason for such constitutional protection is clear:

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. . . .
>
> . . . .
>
> . . . 'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.'
>
> . . . .
>
> . . . Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims,* 377 U.S. at 555–562, 84 S.Ct. at 1378–1381 (quoting *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964)).

While *Reynolds* and numerous other Supreme Court decisions confirm that voting rights are, at bottom, federally protected, it is a closer question whether the actions of

---

5. 42 U.S.C. § 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person

within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Georgia officials amounted to a constitutional violation entitled to a section 1983 remedy in a federal court. As we noted in *Gamza,*

> constitutional decision must not be confined merely to the logical development of the philosophy of prior decisions unfettered by other considerations. The functional structure embodied in the constitution, the nature of the federal court system and the limitations inherent in the concepts both of limited federal jurisdiction and of the remedy afforded by section 1983 must all be fully attended.

619 F.2d at 452. In view of such limitations, this court set forth in *Gamza* the following guide for determining whether a particular challenge to a state election practice rises to a level deserving of federal protection:

> As *Baker v. McCollan,* 433 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), requires in tort cases, the determination that particular conduct constitutes a constitutional deprivation rather than a lesser legal wrong depends on the nature of the injury, whether it was inflicted intentionally or accidentally, whether it is part of a pattern that erodes the democratic process or whether it is more akin to a negligent failure properly to carry out the state ordained electoral process and whether state officials have succumbed to 'temptations to control ... elections by violence and by corruption ....'

619 F.2d at 453 (quoting *Ex parte Yarbrough,* 110 U.S. 651, 666, 4 S.Ct. 152, 159–60, 28 L.Ed. 274, 279 (1884)).

The *Gamza* guidelines are necessarily stated in general terms, but their significance for this case will become clearer after an examination of particular state election practices which have been challenged in this and other federal courts. In *Powell v. Power,* 436 F.2d 84 (2d Cir. 1970), for example, the Second Circuit held that the due process clause of the fourteenth amendment offers no guarantee against an unintentional error in the supervision of an election which allowed a number of people to cast ballots even though they were unqualified under

state law to participate in the election. The court noted that to interpret section 1983 as providing a remedy for all election irregularities would cause the federal courts to be "thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." 436 F.2d at 86. The *Powell* court concluded that the federal courts are neither equipped, nor empowered, to rectify every alleged election irregularity.

The Seventh Circuit likewise denied relief under section 1983 in a case involving the malfunctioning of voting machines and innocent human errors in the administration of a local election. *Hennings v. Grafton,* 523 F.2d 861 (7th Cir. 1975). Recognizing that such errors are inevitable in a society which relies upon volunteers to conduct most elections, the *Hennings* court held that fully-adequate state review procedures provide the appropriate avenue for the redress of inadvertent election mistakes. The Seventh Circuit acknowledged, however, that section 1983 does provide a remedy for the violation of due process rights through "willful conduct which undermines the organic processes by which candidates are elected." 523 F.2d at 864.

The Eighth Circuit similarly refused to interject the federal courts into a controversy over whether illegally cast ballots were mistakenly counted by local election officials. *Pettengil v. Putnam County R–1 School District,* 472 F.2d 121 (8th Cir. 1973). The court indicated, however, that federal intervention would be appropriate in cases presenting "aggravating factors such as ... unlawful conduct which interferes with the individual's right to vote ...." 472 F.2d at 122.

We have also returned litigants with garden variety election challenges to the state tribunals and procedures established for the specific purpose of ensuring that the declared winner of an election has actually received the highest number of legally cast ballots. *E. g., Hubbard v. Am-*

*merman,* 465 F.2d 1169 (5th Cir. 1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973); *Johnson v. Hood,* 430 F.2d 610 (5th Cir. 1970). In so doing, we have recognized that the constitution leaves to the states broad power to regulate the conduct of federal and state elections. *See generally Roundebuss v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972); *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). In fact, we have specifically recognized that states enjoy broad authority to dispense with the elective process and provide by law that judicial vacancies shall be filled by gubernatorial appointment rather than popular election. *Holley v. Askew,* 583 F.2d 728 (5th Cir. 1978).

Despite this broad authority enjoyed by the states over the scope and conduct of elections, the federal courts have not hesitated to interfere when state actions have jeopardized the integrity of the electoral process. Of course, most cases of federal court intervention have been brought under the fourteenth amendment's equal protection clause and concerned the purposeful denial, or dilution, of the voting rights of a segment of the electorate. In *Bell v. Southwell,* 376 F.2d 659 (5th Cir. 1967), for instance, this court voided a state election and ordered a special election—with full recognition of the "[d]rastic, if not staggering" nature of this relief—because racially discriminatory practices in the administration of a local election rose in constitutional significance far above the usual claim of election irregularities.

Less frequent than such equal protection cases are those instances in which federal courts have intervened in state election matters because of a violation of the fourteenth amendment guarantee of due process. On this ground, the Seventh Circuit has held that section 1983 provides a federal remedy if state officials place a sham candidate on a ballot in order to appoint his successor following his expected victory and pre-arranged resignation. *Smith v. Cherry,* 489 F.2d 1098 (7th Cir. 1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). The *Smith* court concluded that

officials had effectively disenfranchised the entire electorate:

> Those who thought they were voting for [the sham candidate] were as a practical matter voting for whomever the [officials] might thereafter select.... This deception on the face of the ballot clearly debased the rights of all voters in the election. Such an abridgement of the right to vote is impermissible and evinces the sufficiency of this complaint.

489 F.2d at 1102.

The Seventh Circuit came to the same conclusion when state officials failed to notify prospective candidates of new and rigorous ballot placement procedures and then denied these candidates an adequate opportunity to examine nomination petitions which had been disqualified. *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970). In this due process case, the court reasoned (a) that the "liberty" protected from state impairment by the due process clause of the fourteenth amendment includes the freedoms of speech and association guaranteed by the first amendment; (b) that these first amendment freedoms extend to political activities such as running for elective office; and (c) that state election practices must therefore serve legitimate state interests "narrowly and fairly to avoid obstructing and diluting these fundamental liberties." 435 F.2d at 1054.

The First Circuit has likewise granted relief under section 1983 when state election officials offered the electorate absentee ballots which were later declared invalid on the ground that state law precluded their use in the challenged election. *Griffin v. Burns,* 570 F.2d 1065 (1st Cir. 1978). In ordering a new election, the *Griffin* court employed an analysis similar to that used by this court in *Gamza.* The First Circuit recognized that the administration of elections is generally a matter of state concern, but noted that "Supreme Court decisions leave no room for doubt that plaintiffs' voting rights are, at bottom, federally protected." *Griffin,* 570 F.2d at 1075. The *Griffin* court proposed the following guide

for determining whether a particular challenge to a state election practice constitutes one of the extraordinary cases in which federal intervention is appropriate:

If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots . . . .

. . . .

. . . [Federal courts have properly intervened when] the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted. The federal courts were not asked to count and validate ballots and enter into the details of the administration of the election. Rather they were confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed. Due process, '[r]epresenting a profound attitude of fairness between man and man, and more particularly between individual and government,' . . . is implicated in such a situation. . . . In cases falling within such confines, we think that a federal judge need not be timid, but may and should do what common sense and justice require.

Griffin, 570 F.2d at 1077–78 (quoting Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). The Griffin court acknowledged that there is no single, bright line to distinguish cases in which federal intervention is appropriate from those in which it is inappropriate, but the court had no difficulty in finding that disqualification of absentee ballots previously offered by election officials represents "broad-gauged unfairness" that calls for a new election. 570 F.2d at 1078.

The challenge brought in this case resembles that in Griffin since it implicates the very integrity of the electoral process. If the Georgia officials denied the Georgia electorate the right granted by state statute to choose a replacement for Justice Bowles, then we are faced with "patent and fundamental unfairness" in the electoral process. Griffin, 570 F.2d at 1077. The Georgia voters are not asking the federal courts to count ballots or otherwise "enter into the details of the administration of [an] election." 570 F.2d at 1078. Their request is far simpler and more basic: they ask for the election itself, as required by state law.

■ The guidelines set forth in Gamza likewise show that the Georgia voters complain of a "constitutional deprivation rather than a lesser legal wrong." 619 F.2d at 453. In contrast to the isolated election irregularities alleged in Gamza, the denial of a legally-required election obviously "erodes the democratic process." 619 F.2d at 453. Unlike the inadvertent election errors alleged in Gamza, the decision to dispense with a special election was deliberate. As found by the district court:

The Governor, Justice Bowles, and Charles Tidwell considered and discussed the timing of the justice's impending resignation at meetings in the Fall of 1980. . . . After the plaintiffs initiated their efforts, Busbee and Tidwell familiarized themselves with and discussed the special election statute at a meeting on November 24, 1980. The Governor stated at his December 4, 1980 press conference that he did not favor a special election to fill Justice Bowles' seat on the Supreme Court because of the cost involved and the probable low voter turnout. . . .

. . . .

In our view, the evidence establishes that Justice Bowles resigned his office, including his new term, on November 20, 1980, that the defendants had decided to replace the justice by appointment rather than by special election, and that the process by which the Governor selects and appoints justices to the appellate courts in Georgia had been initiated and was operating with the knowledge, consent, and cooperation of defendants Busbee and Bowles after November 20, 1980.

■ The Georgia voters may complain of a far more serious legal wrong than that established in Griffin and contemplated in Gamza because the entire state electorate

has been deprived of the right to participate in an election. The district court stated that it "can conceive of no more fundamental flaw in the electoral process than the deprivation of the right to vote altogether." We likewise can imagine no claim more deserving of constitutional protection than the allegation that state officials have purposely abrogated the right to vote, a right that is fundamental to our society and preservative of all individual rights. Just as the equal protection clause of the fourteenth amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the fourteenth amendment forbids state officials from unlawfully eliminating that fundamental right. The United States Constitution protects against complete deprivation as well as invidious discrimination. It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment. We therefore hold that such action violates the due process guarantees of the fourteenth amendment.

The Georgia officials would avoid this conclusion through reliance upon the Supreme Court's decision in *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), and this court's decision in *Johnson v. Hood*, 430 F.2d 610 (5th Cir. 1970). In *Snowden* the high Court said that "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause." 321 U.S. at 7, 64 S.Ct. at 400. In *Johnson* we said that "the right to vote in a state election, in itself, is not a right secured by the constitution or by federal law." 430 F.2d at 610. At first glance, the broad language of *Snowden* and *Johnson* would appear to preclude the section 1983 claim filed by the Georgia voters. Such pronouncements, however, can only be understood in the context of the facts which prompted them: both cases involved garden variety challenges to the manner in which ballots were counted by state election officials. Neither case involved fundamentally

unfair election practices or purposeful conduct which threatened the democratic system. *Snowden* and *Johnson* thus fall in the line of cases holding that the constitution offers no guarantee against insubstantial election irregularities. Reading the language of these cases in the context of their facts, we conclude that neither case precludes our granting of federal relief when public officials disenfranchise an entire electorate in violation of state law. Without challenging the holding in either *Snowden* or *Johnson*, we simply decline to read their broad language as precluding federal relief in this very different case of a fundamental breakdown of the democratic system.

The Georgia officials also rely upon the recent case of *Parratt v. Taylor*, —— U.S. ——, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), which required the Supreme Court to "decide whether the tort remedies which the State of Nebraska provides as a means of redress for property deprivations satisfies the requirements of *procedural due process*." —— U.S. at ——, 101 S.Ct. at 1914, 68 L.Ed.2d at 430 (emphasis added). The *Parratt* Court concluded that Nebraska's judicial remedies fully and fairly compensated those who suffer the tortious taking of property and therefore satisfied the fourteenth amendment requirement of procedural due process.

It is important to recognize that *Parratt* concerned procedural due process rather than substantive due process. The *Parratt* Court was not required to define the limits of those substantive rights which are grounded in the Bill of Rights and applied to the states because of their incorporation into the due process clause of the fourteenth amendment. Once the *Parratt* Court found state procedures fully adequate to satisfy the requirements of due process, the constitutional basis of that section 1983 case disappeared.

The voters in this case, by contrast, do not base their section 1983 claim upon any inadequacy in Georgia's judicial remedies. Their due process claim is not procedural, but substantive: they allege the unlawful

abrogation of a constitutionally protected right to vote. *Parratt* relegates those who claim procedural unfairness to state judicial remedies when those remedies afford procedural due process. *Parratt* provides no support to the Georgia officials, however, because this case turns on the substantive guarantees of the due process clause. *Parratt* gives us no hesitation in holding that one of those guarantees is the right to be free from the purposeful decision of state officials to deny the citizens of a state the right to vote in an election mandated by law.

## GEORGIA ELECTION LAWS

Georgia's special election law provides that "whenever any person elected to public office shall die or withdraw prior to taking office . . . then [state officials] shall thereupon call a special . . . election to fill such position." Ga.Code § 34–1514. Justice Bowles was elected to serve on the Georgia Supreme Court for a term to begin on the first day of 1981, and the district court found that he withdrew from this office by resigning permanently prior to taking office. Since a statute should normally be interpreted in accordance with the plain meaning of its language, *Perrin v. United States*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1980), the simple words of section 34–1514 would seem to require the calling of a special election to replace Justice Bowles. The Georgia officials make five separate arguments, however, to show that they legally replaced Justice Bowles through gubernatorial appointment. Their

first three arguments challenge the district court's interpretation of Georgia's election laws; their remaining two arguments challenge the district court's factual findings.

First, the Georgia officials perceive a difference under Georgia law between resigning from a current term of office and withdrawing from a future term. The concept of "withdrawal" embodied in the special election statute is said to exclude a resignation such as that tendered by Justice Bowles and accepted by Governor Busbee. Justice Bowles termed his November letter as a letter of resignation and Governor Busbee treated it as such. The special election statute uses the term "withdrawal," Ga. Code § 34–1514, while the statute which lists the various ways in which a vacancy may occur speaks in terms of a "resignation." Ga.Code § 89–501(1).[6]

The district court concluded, however, that for purposes of triggering the special election requirement, a resignation constitutes a withdrawal from public office. The court stated:

Although the statute specifies only death and withdrawal as events which trigger a special election, it seems clear that the legislature meant, by withdrawal, any voluntary vacating of the position to which one had been elected. The ordinary, logical means by which an incumbent voluntarily leaves office is by resignation. Therefore, if the statute is to serve its intended purpose, its language must be construed to encompass resignations. Moreover, we note that the defendants' awareness of the now asserted-

6. Ga.Code § 89–501 provides:
All offices in the State shall be vacated—
1. Death
By the death of the incumbent.
2. Resignation
By resignation, when accepted
3. Judgment
By *decision of a competent tribunal declaring* the office vacant.
4. Incapacity
By voluntary act or misfortune of the incumbent, whereby he is placed in any of the specified conditions of ineligibility to office, which shall operate from the time the fact is ascertained and declared by the proper tribunal.
5. Nonresidence

By the incumbent ceasing to be a resident of the State, or of the county, circuit, or district for which he was elected. In the first case the office shall be vacated immediately; in the latter cases, from the time the fact is judicially ascertained.
6. Failing to obtain commission or give bond
By failing to apply for and obtain commissions or certificates, or by failing to qualify or give bond, or both, within the time prescribed by the laws and Constitution.
7. Abandonment of office
By abandoning the office and ceasing to perform its duties, or either.

ly crucial distinction between withdrawal and resignation appears to be of recent origin. By their own testimony, the defendants were unaware of the difference at the time Justice Bowles submitted his first resignation letter on November 20, 1980, and they failed to make the point during their depositions in this matter in early March 1981. Nor have the defendants cited any cases supporting their construction of the statute. In these circumstances, we decline to superimpose a technical requirement of 'withdrawal' on the facially clear special election statute.

We agree that the term "withdrawal" in the special election statute must be read to encompass "resignations." Only then will it effectuate the legislative purpose of allowing the people of Georgia to fill vacancies which occur in elective offices either voluntarily (by withdrawal) or involuntarily (by death) before an elected official assumes office.

Second, the Georgia officials argue that Justice Bowles was incapable of triggering the requirement for a special election since it is legally impossible for a person to resign from a term of office which has not begun. Justice Bowles's resignation letter of November 20, 1980, is therefore said to have been ineffective as a resignation from the term to which he had been recently elected, but which would not begin until the first day of 1981. This argument appears to proceed as follows: The cases of *Crovatt v. Mason*, 101 Ga. 246, 28 S.E. 891 (1897) and *Hardwick v. Swearingen*, 12 Ga. 23 (1852), show that Georgia's special election statute codifies a common-law rule requiring the calling of a new election when the winner of an election is ineligible to assume office. Since the special election statute codifies one common-law doctrine, we are urged to read into it other common-law doctrines pertaining to elections. One such doctrine provides that a person cannot resign from a term of office which he has not yet assumed, as shown by the cases of *Miller v. Sacramento County*, 25 Cal. 93 (1864); *Partain v. Maddox*, 227 Ga. 623, 182 S.E.2d 450 (1970); *Patten v. Miller*, 190 Ga. 123, 8 S.E.2d 757 (1940); and *Dibelka v. Reinberg*,

263 Ill. 536, 105 N.E. 715 (1914). The word "withdrawal" in the special election statute is therefore said to exclude an attempted resignation from a future term of office.

Even if the special election statute codifies one common-law doctrine, and even assuming that another common-law doctrine precludes resignations from future terms, no legal principle compels the superimposition of two legal doctrines simply because they date from the same era. Judicial duty prohibits us from doing so when this would violate the intent of the Georgia Legislature. In passing the special election statute, the Georgia Legislature intended to allow the electorate to fill an elective term which would be vacant from its inception. By specifying death and withdrawal as events which trigger the special election requirement, the legislature indicated the full reach of its intention by providing for a new election when either involuntary or voluntary actions created such a vacancy. We would dishonor this intention by imposing upon the wide reach of the special election statute a prohibition upon resignation from future terms. If the courts were to require an official in Justice Bowles's position to assume an upcoming term of office before submitting a letter of resignation, this would always leave an unexpired term rather than a full term of office. Since state law provides for executive appointment to fill an unexpired term on the Georgia Supreme Court, such a judicial interpretation would read a severe limitation into broad statutory terms without any indication that this would serve an unexpressed legislative purpose. *See* Ga.Const. art. 6, § 2, ¶ 3. We therefore decline to superimpose upon the simple words of the special election statute a common-law doctrine which threatens to violate the apparent intentions of the Georgia Legislature.

The Georgia officials' third argument is that even if a resignation from a future term of office can trigger the requirement of a special election, Justice Bowles did not effectively resign because he addressed his November letter of resignation to the governor instead of the Georgia Secretary of

State. The common law requires that a resignation be directed to, and accepted by, the authority empowered to act upon that resignation before an intended resignation is legally effective. *Edwards v. United States*, 103 U.S. 471, 26 L.Ed. 314 (1880). Only the secretary of state is authorized to call a special election to fill a vacancy on the Georgia Supreme Court. Since Justice Bowles addressed his November letter to the governor instead of the secretary of state, it is said to have been ineffective as a resignation under the common law, and thus ineffective as a "withdrawal" under the special election statute.

Though the secretary of state alone is empowered to call a special election under the circumstances of this case, neither the special election statute which conveys this power, nor any other statute indicates that a resignation which triggers such an election should be submitted to the secretary. The only Georgia statute dealing with the reporting of resignations states that "resignations of all officers [1] whose commission issued from the office of the Secretary of State or the Executive Department, and [2] whose places *may* be supplied by executive appointment, shall be made to the Governor." Ga.Code § 89–504 (emphasis added).

■ We agree with the district court that this statute answers the argument of the Georgia officials by showing that Justice Bowles properly addressed his November letter of resignation to the governor. Justice Bowles's position satisfied the first requirement of section 89–504: his commission as an Associate Justice of the Georgia Supreme Court issued from the secretary of state. Ga.Code § 89–201. As for the second requirement of section 89–504, it is true that a special election is required in those unusual cases in which a person elected to a term on the court dies or withdraws prior to taking office. Ga.Code § 34–1514.

Executive appointment, though, is the means established by the Georgia Constitution for filling a vacancy which occurs in the more typical case in which a vacancy creates an unexpired term. Ga.Const. art. 6, § 2, ¶ 3.[7] While executive appointment is not the exclusive means of filling a vacancy on the Georgia Supreme Court, and is not the method required in this case, the fact that the commission of an associate justice issues from the secretary of state and that replacement of an associate justice "may be supplied by executive appointment" brings this case within the reach of section 89–504. *Cf. Op. Ga. Att'y Gen. U74–29* (1974) (compliance with the commission requirement of section 89–504 suffices to bring sheriffs within the reach of this statute even though they are never replaced by executive appointment). Justice Bowles properly submitted his November letter of resignation to the governor and the governor properly accepted it.

In their fourth and fifth arguments, the Georgia officials make alternative challenges to two factual findings of the district court. They argue that the district court erred in concluding that when Justice Bowles sent his November letter, he intended to resign from his upcoming term beginning in January. Assuming that this was Bowles's intention in November, the Georgia officials also argue that the district court failed to recognize that he intended to rescind his prior resignation by taking the oath of office on December 15, 1980, and entering into the duties of the new term on January 5, 1981.

■ In considering these arguments, we are bound by Federal Rule of Civil Procedure 52(a) which states that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge

---

7. Ga.Const. art. 6, § 2, ¶ 3 provides, in pertinent part:

The Justices [of the Georgia Supreme Court] . . . shall hold their offices for six years, and until their successors are qualified. They shall be elected by the people at the same time and the same manner as members of the General Assembly. In case of any vacancy which causes an unexpired term, the same shall be filled by executive appointment, and the person appointed by the Governor shall hold his office until the next regular election, and until his successor for the balance of the unexpired term shall have been elected and qualified.

of the credibility of the witnesses." Thus, factual findings of a district court cannot be set aside on review unless clearly erroneous. *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981). The function of a reviewing court is not to retry issues of fact or to substitute its judgment for that of the district court. *Dickens v. United States*, 545 F.2d 886 (5th Cir. 1977). A finding is reversible under rule 52(a) only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The district court summarized its factual conclusions as follows:

In our view, the evidence establishes that Justice Bowles resigned his office, including his new term, on November 20, 1980, that the defendants had decided to replace the justice by appointment rather than by special election, and that the process by which the Governor selects and appoints justices to the appellate courts in Georgia had been initiated and was operating with the knowledge, consent, and cooperation of defendants Busbee and Bowles after November 20, 1980. To adopt the defendants' explanation for their actions would require a distortion of the facts ... and the obvious intent of the parties. The alternative and less strained explanation—that Bowles inadvertently resigned at a time when a special election would be necessary to fill his position—is more logical and likely.

Before reaching this conclusion, the district court heard extensive evidence, including the testimony of Justice Bowles and Governor Busbee. The district court's carefully written opinion demonstrates the solicitude with which it considered the evidence and arguments offered by the Georgia officials. The district court carefully pointed out that its conclusions were

not based on the finding that defendants' objective was to disenfranchise the voters. It has been the custom in the executive office over the years to appoint

judges, and this practice has, in fact, frequently redounded to the public's benefit in the selection of able and qualified members of the judiciary. In this instance, however, the presumption that the office would be filled by executive appointment and the desire to exercise the Governor's prerogative overrode the statutory obligation to call a special election, and resulted in an infringement of the plaintiffs' right to vote.

 The record developed before the district court persuades us that it has fairly and correctly interpreted the actions and motives of the Georgia officials. We affirm its finding that on November 20, 1980, Justice Bowles intended to resign from his upcoming term and that on the next day the governor accepted his resignation with the understanding that it constituted a permanent resignation. We likewise affirm the finding of the district court that "there clearly was no change in Bowles' intention to leave the court, or in the Governor's intention to select his successor."

## CONCLUSION

We reject each of the three arguments advanced in this appeal. First, we find no abuse of discretion in the refusal of the district court to abstain from hearing this section 1983 claim. Second, we hold that the due process clause of the fourteenth amendment affords protection against the disenfranchisement of a state electorate in violation of state election law. Third, we agree with the district court that the plain meaning of Georgia's special election statute, Ga.Code § 34–1514, requires the calling of a special election under the circumstances of this case. The decision of the district court is affirmed.

AFFIRMED.

## APPENDIX

On April 25, 1977, Jesse G. Bowles was appointed by Governor Busbee as an Associate Justice of the Supreme Court of Georgia. Justice Bowles was subsequently elected, on November 7, 1978, to fill a term of office as an Associate Justice until De-

cember 31, 1980. The justice encountered personal problems during his tenure on the court, however. Family arrangements required that the justice commute from Cuthbert in southern Georgia to Atlanta on a weekly basis, and the necessity and expense of supporting two homes caused financial and marital strain. The problems became so acute that, in October 1979, the justice met with Governor Busbee to discuss the possibility of resigning from the court. The Governor urged Justice Bowles to continue on the court at that time, and the justice agreed.

On June 11, 1980, Justice Bowles qualified to run in the Democratic primary for election to a full term on the court. Unfortunately, the justice's personal situation continued to deteriorate throughout 1980, and he continued seriously to consider resigning from the court. On August 5, 1980, Justice Bowles was nominated in the Democratic Party primary for election to the office of Associate Justice of the Supreme Court of Georgia.

In early August 1980, Bowles attempted to discuss the potential effects of his withdrawal from the race with someone at the Democratic Party headquarters. Receiving no useful information there, Bowles sought out Charles Tidwell, the Governor's executive counsel in charge of judicial nominations, to explore the statutory provision, party rules, and prior practices regarding resignations from the court. The two men discussed the mechanics by which a substitute nominee would be chosen in the time periods preceding the general election as specified by statute. See Ga. Code § 34–1003. Tidwell told Bowles that the Governor would have some influence in the selection process, but would not be able to control it. Bowles asked Tidwell to review the election laws to determine the effect of his resignation.

In September 1980, Justice Bowles informed Tidwell that he was intending to resign. Bowles, Tidwell, and Busbee met on September 24 to discuss the justice's resignation. The three men discussed the possible procedural and political ramifications of various resignation dates. The three men testified that they were not aware of and did not discuss at that time the provision in the Georgia Code providing for a special election when an official elected at a general election withdraws before taking office. Ga. Code § 34–1514. Justice Bowles left the meeting with the Governor and Mr. Tidwell stating that he would not resign at that time.

Justice Bowles was reelected to office on November 4, 1980. Nevertheless, he continued to deliberate as to whether, when, and how he should resign. Charles Tidwell knew that the Judicial Nominating Commission [1] (Commission), which screens applicants for appointment to the state court benches, would be meeting on December 11 and 12, 1980, to discuss candidates for appointment to the soon-to-be-vacant seat of George T. Smith on the Georgia Court of Appeals.[2] The Commission met infrequently, only at the Governor's request, and needed at least three weeks to distribute notices of a particular vacancy so that applicants would have a chance to respond and be considered at the next meeting. Aware of the Commission's time schedule and hoping to avoid duplicative effort by the Commission, Tidwell called Justice Bowles in an attempt to coordinate the Smith and Bowles resignations. Mr. Tidwell informed the justice that the last possible day to resign and trigger the nominating process for his seat would be November 20, 1980.

Justice Bowles wrote a letter of resignation dated November 20, 1980, and deliv-

---

1. The Judicial Nominating Commission is an independent commission created by Executive Order, responsible for soliciting and screening applicants for appointment to vacancies in the state courts. Defendants' Exhibits 1–5. The Commission consists of five *ex officio* members of the State Bar of Georgia, and five members appointed by the Governor from the public at large. The deliberations and nominations of the Commission are confidential.

2. George T. Smith ran for election to the Georgia Supreme Court while a member of the Georgia Court of Appeals, and was elected on November 4, 1980.

ered it to Mr. Tidwell on. that date. The letter did not include an effective date, however. The two men discussed the omission, Mr. Tidwell advising the justice that the effective date was his decision. Justice Bowles then included the words "effective December 31, 1980" on the letter. Plaintiffs' Exhibit A. Mr. Tidwell informed the Commission that day to begin seeking and screening candidates for Justice Bowles' seat. The resignation was accepted by Governor Busbee by letter dated November 21, 1980.[3] Plaintiffs' Exhibit C.

Sometime prior to November 21, 1980, Justice Bowles had asked Charles Webb, administrative aide to the Chief Justice, to prepare a press release on his resignation, but to hold the release until notified by Justice Bowles. The justice wanted a release prepared to be sent to county weekly publications around Cuthbert, Georgia, where he planned to return to practice law. The press release was prepared on Supreme Court stationery and stated that Justice Bowles "has resigned to return to the private practice of law at Cuthbert," and that he had written Governor Busbee asking "that his resignation be made effective as of Dec. 31." Plaintiffs' Exhibit M. The story of the resignation had by this time been reported in the press, and Mr. Webb called the justice to suggest that the statement be released. The justice agreed. Mr. Webb read him the text of the statement over the phone, and it was dated and distributed on November 21, 1980.[4]

Chief Justice Undercofler also released a short statement on November 21, 1980, having been told by Justice Bowles the previous afternoon that he was leaving the court. Justice Undercofler stated that he "regrets that Justice Jesse G. Bowles has decided to leave the Supreme Court of Georgia." Plaintiffs' Exhibit N. Justice Undercofler testified that he fully expected

Justice Bowles to take the oath of office on December 15, 1980, for his new term beginning in 1981, but conceded that he had no factual basis for his belief.

On November 24, 1980, Charles Tidwell met with Governor Busbee and told him that he was coordinating Justice Bowles' resignation with the Commission's schedule. The two men discussed the recent news reports on the justice's resignation and reviewed the special election law. Both were concerned about the expense of holding a special election and the likelihood of low voter turnout so soon after a general election.

Sometime after this meeting, Judge Quillian of the Georgia Court of Appeals called the Governor to request a speedy appointment of a replacement for the departing Judge George T. Smith. The Governor told him that he intended to wait and make a double appointment, simultaneously replacing both Judge Smith and Justice Bowles.

The plaintiffs began their quest for a special election shortly after reading in the newspapers of Justice Bowles' resignation from the court on November 20, 1980. Aware of the provision for special elections in the Georgia Code, and concerned that all appellate judges in the state currently serving were appointed rather than elected to their initial terms of office, plaintiffs wrote and hand delivered to Secretary Poythress on December 3, 1980, a letter requesting a special election. Plaintiffs' Exhibits E, X.

On December 4, 1980, Governor Busbee held a press conference. When asked at the conference if he would support a special election for Supreme Court justice, the Governor stated he would not on the ground that it would cost the state over one million dollars and probably result in a small voter turnout. That same day, one of the plaintiffs visited Justice Bowles at the Supreme Court to inquire of him whether he had

---

**3.** Ga.Code § 89–504 provides:

The resignations of Senators and Representatives in Congress, members of the General Assembly, and of all officers whose commissions issue from the office of Secretary of State, or the Executive Department, and whose places may be supplied by executive appointment, shall be made to the Governor.

**4.** Justice Bowles testified he did not read the statement before it was released. Otherwise, he would have deleted the final paragraph relating to his marriage.

resigned his office. The justice refused to answer the plaintiff's questions, however, telling her he would respond only through the "proper authorities" or "channels." On December 9, 1980, plaintiffs again wrote to Secretary Poythress because they had not yet received a response to their initial inquiry concerning a special election. Plaintiffs' Exhibit G.

On December 15, 1980, plaintiffs met with Mr. Poythress who gave them, in writing, a response to their request for an election. The Secretary stated that he had received a letter dated December 5, 1980, which he had solicited from Charles Tidwell, the Governor's executive counsel, explaining that Justice Bowles' resignation effective December 31, 1980, was intended to apply only to his currently held term of office which would expire as a matter of law on December 31, 1980. Mr. Tidwell wrote to the Secretary that

> [w]hile it is only private supposition upon my part at this time, I would not be surprised if sometime after Justice Bowles assumes his newly elected office . . . he should resign. In anticipation of this eventuality, we have requested the Judicial Nominating Commission to initiate their screening processes of candidates to fill by executive appointment any vacancy which might occur.

Plaintiffs' Exhibit F. As a result of this letter, Secretary Poythress told the plaintiffs that "Justice Bowles' resignation, and the Governor's acceptance thereof, were intended by both men to relate to Justice Bowles' presently held commission which expires December 31, 1980." In addition, he stated that Justice Bowles had "verbally confirmed to [him] that such was his intention and that he does intend to enter upon the duties of the new term of office beginning on January 1, 1981." Plaintiffs' Exhibit H. Therefore, a special election would not be required. However, the defendants did not issue a public statement to correct the news reports that Justice Bowles was resigning from the Supreme Court as of December 31, 1980. Justice Bowles took the oath of office for his new term on December 15, 1980.

On the same day, December 15, the plaintiffs visited Mr. A. G. Cleveland, the head of the Governor's Judicial Nominating Commission. Mr. Cleveland told the plaintiffs that the Commission was working on a list of nominees to give to Governor Busbee as potential candidates for appointment to both Justice Bowles' seat on the Supreme Court and Judge Smith's seat on the Court of Appeals. On December 16, the plaintiffs read in the newspapers that Justice Bowles had, the day before, taken the oath of office for his new term beginning January 1, 1981. Believing that Justice Bowles intended to serve his new term, the plaintiffs abandoned their campaign for a special election.

At a meeting on December 17, Mr. Tidwell, who had picked up the list of nominees from the Commission the previous day, told the Governor that he could not fill Justice Bowles' seat until Bowles resigned his new commission sometime after January 1, 1981. The Governor interviewed candidates for both positions on December 18, and appointed Judge Smith's replacement, who was sworn in January 5, 1981.

According to his testimony, Justice Bowles continued actively to consider leaving the court throughout this period, but it was not until all hope of resolution of his personal problems had dissolved over the Christmas holidays that he decided on January 2, 1981 that he would make a final decision on January 5, his first day in his chambers in the new term. On the morning of January 5, Justice Bowles returned to the courthouse and called Hardy Gregory, Jr. to discuss Gregory's appointment and whether the new justice would like to interview Justice Bowles' staff or retain his parking place at the court building.

Around noon on January 5, Justice Bowles sent a letter of resignation to the Governor. The resignation was accepted in writing by the Governor on the same day. Plaintiff's Exhibits J, K. On January 6, the plaintiffs read in the newspapers that Justice Bowles had resigned his office effective immediately, and that the Governor had selected his successor. Governor Busbee

administered the oath of office to Associate Justice Hardy Gregory, Jr. on January 8, 1981. On the following day the plaintiffs delivered to Secretary of State Poythress another letter demanding a special election. The plaintiffs received no response, and approximately three weeks later filed this suit.