**MEMBERS OF the CALIFORNIA DEMOCRATIC CONGRESSIONAL DELEGATION, et al., Plaintiffs,**

**v.**

**March Fong EU, et al., Defendants.**

**Mexican American Legal Defense and Educational Fund, on behalf of Sebastian Benavidez, et al., Intervenors.**

No. C–91–3383–FMS.

United States District Court,
N.D. California.

March 3, 1992.

Jonathan H. Steinberg, Irell & Manella, Los Angeles, Cal., Denise M. Hulett, Mexican American Legal Defense & Educ. Fund, San Francisco, Cal., Joaquin G. Avila, Milpitas, Cal., for plaintiffs.

Anthony L. Miller, Chief Counsel, Richard S. Nishite, Oliver S. Cox, Sacramento, Cal., for defendants.

Joseph Remcho, Remcho Johansen & Purcell, San Francisco, Cal., for Assembly of Cal. State.

Bion Gregory, Legislative Counsel, Sacramento, Cal., for Senate of Cal. State.

Robert E. Cooper, Gibson Dunn & Crutcher, San Francisco, Cal., for California Governor.

Before TANG, Circuit Judge, SMITH and LEGGE, District Judges.

## OPINION AND JUDGMENT
## OF DISMISSAL

LEGGE, District Judge:

This action involves various challenges to the redistricting or reapportionment[1] of

---

**1.** The term "reapportionment" describes the process of allocating representatives among pre-

the voting districts in the State of California which has been approved by the California Supreme Court. Plaintiffs and intervenors moved in this court for a preliminary injunction to restrain implementation of that redistricting plan, and instead to compel the Secretary of State of California to implement alternate plans proposed by them.

On January 28, 1992 this court denied the motions for preliminary injunction. Because of the time urgency of advising the Secretary of State of our decision so that the statewide primary elections scheduled for June 1992 could be held, there was not then time for this court to prepare and publish an opinion. This opinion discusses the reasons for the denial of the preliminary injunctions, and further concludes that this action should be dismissed.

## I.

Following the 1990 census, the State of California was mandated to adjust the boundary lines of its voting districts for state legislative representatives and for representatives to the United States Congress. U.S. Const. Article I, § 2; Cal. Const. Art. XXI, § 1. This responsibility primarily lies with the legislature and governor of the state. *Assembly v. Deukmejian*, 30 Cal.3d 638, 180 Cal.Rptr. 297, 639 P.2d 939 (1982); *Legislature v. Reinecke*, 6 Cal.3d 595, 99 Cal.Rptr. 481, 492 P.2d 385 (1972). However, they were unable to agree.

On September 6, 1991 Governor Pete Wilson filed a petition with the California Supreme Court, alleging the failure of the state legislative process to produce a redistricting plan following the 1990 census and requesting the California Supreme Court to assume jurisdiction. Shortly thereafter, the California Legislature presented the governor with three redistricting plans.

On September 23, 1991 the governor vetoed those plans. An attempt to override the governor's vetoes failed, and the legislature recessed for the remainder of the year.

Two days later, the California Supreme Court decided to exercise its original jurisdiction; Cal. Const. Art. VI, § 10; *California Education Facilities Authority v. Priest*, 12 Cal.3d 593, 116 Cal.Rptr. 361, 526 P.2d 513 (1974); and issued a writ of mandate compelling the preparation of a redistricting plan. *Wilson v. Eu*, 54 Cal.3d 471, 286 Cal.Rptr. 280, 816 P.2d 1306 (1991). The Supreme Court appointed three special masters to hold public hearings, take evidence, hear arguments, and recommend a redistricting plan to that court. The California Supreme Court directed that the masters be guided by various standards, including the federal Voting Rights Act, 42 U.S.C. § 1971, *et seq.*, the United States Constitution, the California Constitution, and state criteria developed in prior litigation. *See Legislature of California v. Reinecke*, 10 Cal.3d 396, 110 Cal. Rptr. 718, 516 P.2d 6 (1973). The masters undertook their assigned tasks. They retained staff assistance, held public hearings, and accepted evidence and arguments from interested parties. On November 29, 1991 they filed their report and recommendations with the California Supreme Court. Their report included plans for redistricting the legislative districts for both houses of the state legislature and for the congressional districts.

Following the presentation of their report and plans, the California Supreme Court entertained further briefing and arguments from interested parties. On January 27, 1992 the California Supreme Court issued its opinion, which accepted and adopted the plans proposed by the masters, with certain modifications not relevant

established districts. The term "redistricting" refers to the process of formulating the boundaries of districts. *See Davis v. Bandemer*, 478 U.S. 109, n. 1, 106 S.Ct. 2797, 2800 n. 1, 92 L.Ed.2d 85 (1986) (Powell, J., concurring and dissenting). State legislators redistrict, rather than reapportion, state and federal legislative districts. *See* Dixon, *The Warren Court Crusade*

*for the Holy Grail of "One Man–One Vote,"* 1969 Sup.Ct.Rev. 219, 219 n. 4. Despite these differences, however, the United States Supreme Court's redistricting cases (*e.g., Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)) are often referred to as "reapportionment" cases, and the terms are commonly used interchangeably.

here. *Wilson v. Eu,* 1 Cal. 4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545 (1992).

## II.

The action in this court was commenced on September 30, 1991, while the proceeding before the California Supreme Court was pending.

### A.

The interested parties are the following:

Plaintiffs are members of the California Democratic Congressional Delegation; that is, members of the House of Representatives who belong to the Democratic Party and who are currently elected from districts in California. The delegation's challenge to the redistricting plans is directed at certain of the congressional districts, alleging that they violate the United States Constitution and the Voting Rights Act. Several representatives have withdrawn as plaintiffs, but a substantial number remain.

The first named defendant is March Fong Eu, the Secretary of State of California. Secretary Eu's presence in the case is formalistic, in that she is named as a defendant only because it is her responsibility to apply the districts which are adopted and to conduct the elections using those districts.

The principal defendant, who has actively opposed the injunctions and moved to dismiss the case, is Pete Wilson, the Governor of the State of California. The governor has also moved to strike certain of plaintiffs' filings from the record; in view of our decision to dismiss the case, consideration of that motion is not necessary.

The Assembly and the Senate of the California State Legislature are also named as defendants. They have appeared, not contesting the congressional districts, but instead challenging the new state assembly and state senate districts.

A complaint in intervention was filed by certain California citizens represented by the Mexican American Legal Defense and Educational Fund. The intervenors joined with plaintiffs in challenging certain congressional districts, and also challenged certain state assembly and state senate districts. In addition to basing their challenge on the United States Constitution and the Voting Rights Act, intervenors also allege that the 1990 census undercounted the Latino population of California. This court granted their motion to intervene, but limited the intervention to the issue raised by plaintiffs; that is, the congressional districts. The court also declined to hear the intervenors' challenge based on alleged undercounting in the 1990 census, because this court concludes that constitutional and Voting Rights Act challenges to redistricting must be based upon the reported census figures. *Karcher v. Daggett,* 462 U.S. 725, 731–32, 735–38, 751, 103 S.Ct. 2653, 2658–59, 2660–62, 2670, 77 L.Ed.2d 133 (1983); *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 946 (7th Cir. 1988); *Skorepa v. City of Chula Vista,* 723 F.Supp. 1384, 1390 (S.D.Cal.1989). Intervenors have moved to reconsider the limited nature of the court's grant of intervention. But in view of our conclusion that the action should be dismissed, that motion for reconsideration need not be discussed.

An application was made by attorneys Messrs. Cochran and Dickerson for leave to file an *amicus curiae* brief on behalf of African–American citizens, contending that the new congressional districts undermine the representation of African Americans. Again, because of this court's conclusion that the case should be dismissed, the request for *amicus curiae* standing need not be discussed.

### B.

Because the complaint challenges the constitutionality of the redistricted congressional districts, this three judge court was convened pursuant to 28 U.S.C. § 2284(a). This court has the power to pass upon all questions raised by the record, including questions of jurisdiction. *See Bartley v. Finch,* 311 F.Supp. 876, 878 (E.D.Ky.1970), *aff'd* 404 U.S. 980, 92 S.Ct. 442, 30 L.Ed.2d 364 (1971). The court is directed to proceed as in any case before a single district court judge. The case may be decided on dispositive motions or after a full trial. *See, e.g., Badham v. Eu,* 694

F.Supp. 664 (N.D.Cal.1988) (motion to dismiss granted), *aff'd* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989); *Gingles v. Edmisten,* 590 F.Supp. 345 (E.D.N.C. 1984) (bench trial held), *aff'd in part and rev'd in part,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

### C.

After this court was convened and various motions were made, we recognized the necessity for making rapid decisions on the issues raised. Speed was important because the California Secretary of State advised that the June 1992 elections could not be held unless all judicial decisions on redistricting were completed by the end of January. We therefore decided not to await the decision of the California Supreme Court before analyzing the issues in this case, but rather to convene a hearing to schedule further proceedings. On December 13, 1991 we agreed to issue no rulings pending a decision by the California Supreme Court; however, that delay was expressly not a decision that this court would abstain from proceeding. Schedules for filing of the record and authorities were set, and generally met by the interested parties. We received copies of the masters' proposed plans and copies of all filings made by the parties with the California Supreme Court. An oral argument on all of the issues was held on January 21, 1992. Being fully advised by the parties on the issues and authorities in the case, all judges of this court reviewed the moving and opposing papers, the arguments of counsel, and the applicable authorities while the California Supreme Court case was proceeding.

As stated, the California Supreme Court issued its decision on January 27, 1992, and a copy of that court's decision was immediately delivered to this court. After studying the decision of the California Supreme Court, we unanimously determined on January 28, 1992 to deny the motions by plaintiffs and intervenors for a preliminary injunction.

### III.

■ There is no doubt that this court has jurisdiction over challenges to voting districts based on the United States Constitution or the Voting Rights Act. 28 U.S.C. § 2284(a). However, the governor has moved to dismiss this action on the grounds of abstention. Abstention recognizes that in certain circumstances a federal court, although having jurisdiction over a dispute, should decline to exercise its jurisdiction in deference to the state courts. Abstention is a balance of constitutional federalism. It is based upon the principle of comity between the federal and state systems, and upon a recognition that state courts are as able to enforce litigants' federal rights as is a federal court. *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). *Middlesex County v. Garden State Bar Assoc.,* 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982).

Any broad statement of the principle of abstention, however, overly simplifies the difficult considerations in deciding when abstention should or should not be applied.

### A.

■ We start with the general principle that a federal court should exercise the jurisdiction given to it by the constitution or by congress. "Abstention from the exercise of federal jurisdiction," the United States Supreme Court has instructed, "is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The fact that a state court is adjudicating a claim does not automatically relieve a federal court of its "virtually unflagging obligation ... to exercise the jurisdiction given [it]" by Congress. *Id.* at 817, 96 S.Ct. at 1246. The pendency of an action in a state court "is no bar to proceedings concerning the same matter in the federal court having jurisdiction....". *Id.* Consequently, abstention is warranted "only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct.

1060, 1062–63, 3 L.Ed.2d 1163 (1959). The U.S. Supreme Court has stated that the "task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice … to justify the *surrender* of that jurisdiction." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25–26, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983). (emphasis in original).

■ Abstention in voting rights cases requires further "special consideration" and solicitude for the federal rights involved. *Badham v. United States Dist. Court,* 721 F.2d 1170, 1172 (9th Cir.1983). "[T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. The right is fundamental because [it is] preservative of all rights." *Harman v. Forssenius,* 380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50 (1965).

### B.

Having stated that general starting point, we are then guided in our next steps by numerous cases in which federal courts have abstained in voting rights matters. *E.g., Scott v. Germano,* 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965); *Badham,* 721 F.2d at 1172; *Duncan v. Poythress,* 657 F.2d 691, 697 (5th Cir.1981), *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982); *Bianchi v. Griffing,* 393 F.2d 457, 461 (2d Cir.1968).

### C.

In reliance upon *Scott v. Germano,* the governor urges four different types of abstention as bases for dismissing this action. Because this court decides that it should abstain under the authority of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), we need not discuss the other grounds for abstention asserted by the governor.

■ *Younger* abstention generally prohibits federal courts from restraining or substantially interfering with pending state court litigation. *Younger* was a criminal case in which the criminal defendant asked a federal court to enjoin his prosecution on the ground that it violated the First and Fourteenth Amendments. The United States Supreme Court denied both injunctive and declaratory relief. The Court reasoned that the state court proceedings would provide an adequate forum for the adjudication of the constitutional claims. Permitting federal courts to intrude upon state prosecutions not only would entail duplicative litigation and the attendant risk of conflicting judgments, but would also work great harm to relations between the federal government and the states.

Th[e] underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

401 U.S. at 44, 91 S.Ct. at 750. The availability of federal review by means of a petition to the United States Supreme Court is a sufficient answer to the concern that there be a federal forum for adjudication of federal rights. *Id.* at 57 n. 3, 91 S.Ct. at 750 n. 3. (Brennan, J., concurring); *cf. Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923); *Worldwide Church of God v. McNair,* 805 F.2d 888, 890–91 (9th Cir. 1986).[2]

While *Younger* abstention originated as a prohibition against interfering with state

**2.** The Supreme Court carved out an exception to *Younger* abstention for prosecutions maintained in bad faith. *Younger,* 401 U.S. at 49, 91 S.Ct. at 753; *see infra* note 4. No party here raises that bad faith exception, nor do we find cause for that exception as a basis for this court's continued jurisdiction.

criminal proceedings, the doctrine evolved to apply to state civil proceedings as well. *See, e.g., Middlesex County v. Garden State Bar Assoc.,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (state bar disciplinary proceeding); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (state attachment proceeding); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (state contempt proceeding in a private debt claim); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (quasi-criminal proceeding concerning public nuisance statute). The Supreme Court has stated that the policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when "important state interests are involved." *Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521.

In *Middlesex,* the Court established a three-step inquiry for determining when *Younger* abstention is appropriate in deference to a state civil proceeding: (1) is there an ongoing state proceeding; (2) does the proceeding implicate important state interests; and (3) is there an adequate opportunity in the state proceedings to raise constitutional challenges. *Id.*

■ The parties here do not dispute that the first *Middlesex* test is satisfied. The California state court proceeding was filed before this federal lawsuit commenced. The fact that the state court proceeding has now been concluded, and was concluded before this court issued its order of January 28, 1992, does not alter this first test. The Ninth Circuit has specifically held that the inquiry is whether the state proceeding was pending *before* the federal suit was filed, that the conclusion of the state case does not avoid abstention, and that dismissal is still required. *Beltran v. State of California,* 871 F.2d 777, 782–83 (9th Cir.1988).

The United States Supreme Court decision in *Scott v. Germano,* 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965), demonstrates the second requirement; that is, that redistricting implicates important state interests. In that case a state court suit challenging the state's redistricting plan was pending before the state supreme court while a similar federal action was being pursued. The U.S. Supreme Court held that the federal court should have abstained in favor of the state proceedings:

> We believe that the District Court should have stayed its hand. The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged.

381 U.S. at 409, 85 S.Ct. at 1527 (citations omitted).

The Supreme Court has also recognized the importance of state considerations in other voting rights cases. *See Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *Karcher v. Daggett,* 462 U.S. at 740, 103 S.Ct. at 2663. Here, the important state interests were specifically addressed by the masters and by the California Supreme Court. *See Wilson v. Eu,* 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 386–87, 823 P.2d 545, 552–53 (1992).

■ The third test for *Younger* abstention—an adequate opportunity in the state proceeding to raise the federal challenges—is also present here. Congress did not vest jurisdiction under the Voting Rights Act in the federal courts exclusively. State courts have concurrent jurisdiction over claims under the United States Constitution and under the Voting Rights Act. *See Hathorn v. Lovorn,* 457 U.S. 255, 268–71, 102 S.Ct. 2421, 2429–31, 72 L.Ed.2d 824 (1982). The United States Supreme Court has expressly recognized that state courts are competent judicial systems for the adjudication of federal issues. *Middlesex,* 457 U.S. at 431, 102 S.Ct. at 2521; *see id.* ("Minimal respect for the state processes ... precludes any *presumption* that the state courts will not safeguard federal constitutional rights.") (emphasis in original).

It is significant that congress gave the state courts concurrent jurisdiction under the Voting Rights Act, rather than conferring exclusive jurisdiction in the federal courts, as it was free to do. Exclusive

jurisdiction would call for us to recognize the primacy of the federal courts in resolving questions under that act and to decline to abstain in this case. The vesting of concurrent jurisdiction, however, indicates both congress' intent and belief that state courts will generally provide due process. We believe this limits our authority to presume otherwise. Contrary to the concern raised by the dissent, our analysis does not foreclose intervention by the federal courts when there are allegations of either bad faith or constitutional infirmities in the state court process. *See* footnotes 2 and 3.

■ Where, as here, congress has provided concurrent jurisdiction over the claims, the test is not whether the California Supreme Court is the best or the ideal forum for litigation of redistricting issues. Rather, the adequacy which *Middlesex* and *Younger* require is only the providing of due process for the adjudication of the federal rights. Once the state provides a forum that accords the parties due process, the United States Supreme Court considers that state forum to be as competent as federal courts for the adjudication of federal issues. *See, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.,* 477 U.S. 619, 628, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986) ("We also have no reason to doubt that Dayton will receive an adequate opportunity to raise its constitutional claims [in state court]."); *Moore v. Sims,* 442 U.S. 415, 435, 99 S.Ct. 2371, 2383, 60 L.Ed.2d 994 (1979) ("We are unwilling to conclude that state processes are unequal to the task of ... deciding the constitutional questions.").

■ We have no doubt that the state proceedings here provided the required due process for the adjudication of the federal issues. The parties raised their contentions under both the United States Constitution and the Voting Rights Act in the proceedings before the masters and before the California Supreme Court. The California Supreme Court expressly recognized

the federal interests to be protected in its order directing how the masters should perform their duties. The masters' report then discussed both the federal and state rights to be protected. Then, in its opinion adopting the masters' plan, the California Supreme Court extensively discussed both the federal constitutional requirements and the Voting Rights Act. This is due process for the adjudication of the federal issues raised.[3]

The United States Supreme Court and the Ninth Circuit have expressed one further qualification to abstention in redistricting and voting rights cases—abstention should not be an excuse for inaction or delay by the state. *See Scott v. Germano,* 381 U.S. at 409–10, 85 S.Ct. at 1526–27; *Badham v. United States Dist. Court,* 721 F.2d 1170, 1172 (9th Cir.1983). In *Harmon v. Forssenius,* 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), for example, the United States Supreme Court affirmed the refusal of a three-judge court to abstain, on the ground of the impracticality of referring the case to the state court because of strict time constraints. *Id.* at 537, 85 S.Ct. at 1183. In the instant case, however, the California Supreme Court and the masters have acted timely, completing their work in time for the California Secretary of State to proceed with the next elections. There has been no reason to believe that the state processes would not be completed in a timely fashion. Moreover, the *Harmon* opinion is further distinguishable in that it predates the Supreme Court's decisions in *Younger* and *Scott v. Germano.*

### D.

In litigation over other important federal rights, the United States Supreme Court and various federal courts of appeal have consistently applied *Younger* abstention, again referring to the important principles of comity, federalism and the ability of state courts to litigate federal constitutional issues. *See, e.g., Ohio Civil Rights*

---

**3.** In *Barry v. Barchi,* 443 U.S. 55, 62 n. 10, 99 S.Ct. 2642, 2648 n. 10, 61 L.Ed.2d 365 (1979), the Supreme Court said that if a plaintiff challenges the very constitutionality of a state court's pro-

cesses, that challenge may be made directly in a federal court. The parties here do not so challenge California's processes.

*Comm'n v. Dayton Christian Schs., Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986); *Middlesex County v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Temple of Lost Sheep v. Abrams,* 930 F.2d 178 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991); *Duty Free Shop, Inc. v. Administracion de Terrenos de Puerto Rico,* 889 F.2d 1181 (1st Cir.1989); *Beltran v. State of California,* 871 F.2d 777 (9th Cir.1988); *Kitchens v. Bowen,* 825 F.2d 1337 (9th Cir.1987); *Fresh Int'l v. ALRB,* 805 F.2d 1353 (9th Cir.1986); *Worldwide Church v. McNair,* 805 F.2d 888 (9th Cir.1986).

■■■■■■ The line of United States Supreme Court and circuit court decisions since *Scott v. Germano* in 1965 and *Younger v. Harris* in 1971 is virtually unbroken, all leading to the same conclusion. That is, if a state court proceeding is pending at the time federal litigation is begun, and if the *Middlesex* criteria are satisfied, a federal court should abstain. That conclusion is particularly true in this case, where the litigants actively participated in the proceedings before the masters and the California Supreme Court, and where both the masters and the California Supreme Court gave careful consideration to both federal and state rights.[4]

■■■■ The fact that this is a voting rights case does not alter that conclusion. *See Germano,* 381 U.S. at 409, 85 S.Ct. at 1526; *Badham v. District Court,* 721 F.2d at 1172; *Duncan v. Poythress,* 657 F.2d 691, 697 (5th Cir.1981) ("An alleged denial of voting rights does not, in itself, constitute a 'special circumstance' which automatically precludes federal court abstention."), *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982). Absent the conferring of exclusive jurisdiction on the federal

courts, and absent allegations that the state court's proceedings were in bad faith or unconstitutional, we must abstain and presume that the state courts will safeguard federal constitutional and voting rights. *See Middlesex,* 457 U.S. at 431, 102 S.Ct. at 2521.

### IV.

■■■ Where abstention is required, and the state court proceeding has been concluded, the remedy is dismissal. *Beltran v. California,* 871 F.2d 777, 782–83 (9th Cir.1988).

IT IS THEREFORE ORDERED that the motions for preliminary injunction are denied, that the action is dismissed, and that a judgment of dismissal is hereby entered.

TANG, Circuit Judge, dissenting:

In 1957, Reverend Martin Luther King, Jr. awakened the conscience of this country to the heart-felt desire of African Americans and other minorities to participate in the American electoral process on an equal footing:

> The denial of this sacred right [to vote] is a tragic betrayal of the highest mandates of our democratic traditions and it is democracy turned upside down.
>
> So long as I do not firmly and irrevocably possess the right to vote I do not possess myself. I cannot make up my mind—it is made up for me. I cannot live as a democratic citizen, observing the laws I have helped to enact—I can only submit to the edict of others.

Rev. Martin Luther King, Jr., "Give Us the Ballot—We Will Transform the South," address delivered May 17, 1957, *reprinted in A Testament of Hope: The Essential Writings of Martin Luther King, Jr.* 197 (James M. Washington ed., 1986).

---

**4.** Plaintiffs' contention that they made a reservation pursuant to *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), to return to federal court for adjudication of the federal issues is inapposite. *England* reservations are not effective when a federal court abstains under *Younger. See Beltran v. California,* 871 F.2d at 783 n. 8

("[W]hen *Younger* abstention applies, federal plaintiffs cannot reserve their federal claim from state court adjudication for later decision by the federal court."); *see also Temple of the Lost Sheep Inc. v. Abrams,* 930 F.2d at 182–83; *Duty Free Shop, Inc. v. Administracion de Terrenos de Puerto Rico,* 889 F.2d at 1183.

Congress answered Reverend King's call with the passage of the Civil Rights Act of 1964 and the Voting Rights Act of 1965. Through these statutes, Congress provided the framework for an active federal role in the enforcement and vindication of the voting rights of minorities. As part of its plan, Congress vested federal courts with jurisdiction over civil rights actions, and specifically instructed them to adjudicate, by way of a three-judge court, challenges to reapportionment and redistricting plans. *See* 28 U.S.C. §§ 1343, 2284(a); 42 U.S.C. §§ 1971(d), (g). Congress thus envisioned that the federal courts would play an integral role in the protection and promotion of a genuinely universal franchise.

Exercising the jurisdiction Congress assigned them, federal courts over the last thirty years have risen to the task of effectuating the statutory and constitutional civil rights of Americans. Where representative bodies proved hostile to civil rights claimants, the federal courts provided a hospitable forum for resolving grievances. When local courts were populated by judicial officials with a self-interest in preserving the status quo, federal courts provided impartial adjudicators insulated from the pressures of judicial elections and racial politics. Few can deny the critical role that federal courts have played in breathing life into the Civil Rights Act and the Voting Rights Act.

Today, in an unprecedented decision, this court retreats from the jurisdiction Congress has assigned it in the name of comity towards state courts. Perhaps the majority, in so holding, accurately forecasts the path of the current legal trend to exalt procedural purity and judicial etiquette over substantive rights. But because I believe it is Congress's place to define our jurisdiction and Congress's place to determine when the goals of the Civil Rights and Voting Rights Acts have been accomplished such that a federal judicial role is no longer necessary, I respectfully dissent.

The majority holds that *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), requires this court to dismiss this action, leaving discretionary review in the Supreme Court as the plaintiffs' sole federal forum for adjudication of their constitutional and Voting Rights Act claims. I believe that this represents an unwarranted expansion of the *Younger* abstention doctrine and is wholly inconsistent with the federal courts' constitutional obligation to exercise the jurisdiction Congress grants them.

At the outset, I should note that I am wholly in accord with this court's original decision to withhold judgment pending the California Supreme Court's final adoption of a redistricting formula. Both ripeness considerations and *Scott v. Germano*, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965), counselled against this court's premature intervention in the state's effort to draft a redistricting plan. Where the majority and I part company is over its decision to abstain under *Younger* and thereby dismiss this case from federal court all together. *Scott v. Germano* advises federal courts to stay, not fold, their hand. The majority's decision leaves prospective federal court litigants whipsawed between the ripeness and abstention doctrines. Prior to the state court's timely adoption of a redistricting plan, the federal case may not be ripe because there is no clear target for the plaintiffs' objections and no plan for the court to review. But, under the majority's opinion, the moment the case becomes ripe due to the conclusion of the state court proceedings, *Younger* slams shut the federal courthouse door. Abstention becomes a jurisprudential euphemism for the wholesale renunciation of Congress's jurisdictional assignment.

"Abstention from the exercise of federal jurisdiction," the Supreme Court has instructed, "is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). That a state court could adjudicate or even is adjudicating a claim does not automatically relieve a district court of its "virtually unflagging obligation ... to exercise the jurisdiction given [it]" by Congress. *Id.* at 817, 96 S.Ct. at 1246; *see also id.* (" '[T]he pendency of an action in the state court is no bar to proceedings concerning the same

matter in the federal court having jurisdiction...."'") (quoting *McClellan v. Carland*, 217 U.S. 268, 282, 30 S.Ct. 501, 505, 54 L.Ed. 762 (1910)). Consequently, abstention is warranted "only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1062–63, 3 L.Ed.2d 1163 (1959); *see also Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983) ("[W]e emphasize that our task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice ... to justify the *surrender* of that jurisdiction.") (original emphasis).

Abstention in voting rights cases, moreover, requires "special consideration" and solicitude for the cardinal federal rights involved. *Badham v. United States Dist. Court*, 721 F.2d 1170, 1172 (9th Cir.1983) ("[A]bstention orders in cases involving voting rights require special consideration."); *see also Harman v. Forssenius*, 380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50 (1965).

While the majority dutifully acknowledges this judicial presumption against abstention, the opinion fails to articulate what exceptional circumstances or special considerations mandate this court's abdication of jurisdiction. Instead, the majority is content to ground dismissal on the identification of an "important state interest" and an assurance that the state court will afford the litigants due process. *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). I believe that, at least in voting rights cases, more is needed before *Younger* mandates abstention.

I agree that the State of California has an important interest in adjudicating constitutional and Voting Rights Act challenges to its redistricting plan. And it cannot be gainsaid that the California Supreme Court afforded the plaintiffs due process. But this abstention analysis paints only half a picture. Wholly absent from the opinion is any consideration of the countervailing interest in maintaining federal jurisdiction in light of the important federal rights involved. The right to vote sits at the very core of representative democracy. It is, moreover, a tool for self-help. Congressional efforts to eliminate discrimination in the provision of public services and the workplace could only slowly chip away at the wall of racism dividing this country. Making the right to vote a reality for African Americans and other minorities, however, shook the very foundations of the wall by permitting the historical victims of discrimination to vote out the Jim Crow power structure. "Give us the ballot," the Reverend Martin Luther King, Jr. urged, "and we will no longer have to worry the federal government about our basic rights." *Testament of Hope* at 197; *see also Harman*, 380 U.S. at 537, 85 S.Ct. at 1183 ("[T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. The right is fundamental because [it is] preservative of all rights.") (quotations and citations omitted); *Reynolds v. Sims*, 377 U.S. 533, 561–62, 84 S.Ct. 1362, 1381–82, 12 L.Ed.2d 506 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.... [T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights.")

Under our constitutional scheme, it is Congress's prerogative to identify certain rights, such as the right to vote, as deserving of special protection and to instruct the federal courts to act as a watchdog for those rights. *Cf. Hathorn v. Lovorn*, 457 U.S. 255, 271, 102 S.Ct. 2421, 2431, 72 L.Ed.2d 824 (1982) (Rehnquist, J., dissenting). Congress's decision to vest federal courts with jurisdiction of Voting Rights Act claims and challenges to redistricting plans was just such a calculated and delib-

erate assignment of responsibility. Congress considered federal jurisdiction to be a necessary response to the historic obduracy and hostility of state officials—including state judges—towards minorities attempting to exercise their constitutional right to vote. The availability of a federal forum was a necessity, not a mere convenience, for those attempting to eliminate "whites-only" suffrage in the South and other regions of this country. What would have happened if three-judge courts in the 1960s in Mississippi, Alabama, Louisiana, and Georgia had done what this court now does? Can we seriously contend that such a refusal to exercise jurisdiction would not have flown in the face of Congressional intent? Were the protections of the Voting Rights Act and the Constitution to be so easily sidestepped by a Governor's race to the local courthouse?

The majority excuses its abstention decision, in part, on Congress's failure to vest the federal courts with exclusive jurisdiction over voting rights cases. By creating concurrent jurisdiction, however, Congress meant to afford plaintiffs—not judges—the opportunity to select the best forum in which to litigate their particular voting rights case. The mere existence of concurrent jurisdiction does not give federal judges the power subsequently to veto a plaintiff's decision to proceed in federal court.

Admittedly, the present redistricting case arises in a social, political, and legal context far removed from the early voting rights struggles. The plaintiffs do not contend that the California Supreme Court's plan is the product of racial bias or animus, nor do they label it a racial gerrymander. The palatability of the instant case, however, does not justify the majority's surrender of jurisdiction for three reasons.

First, I fear that the majority's opinion elevates procedural tidiness over the hard reality of racism, bigotry, and political machination that comprises the vast majority of this country's voting history. Although many take it for granted, a genuinely universal franchise for all citizens, regardless of race, creed, color, or gender, has only recently taken root in this country. It remains a novelty, not a custom. It is thus much too soon for federal courts to let down their guard. Complacency is the thief of social progress.

*Younger* abstention comes easily in cases like the present. Although Latino, African American, and Asian representatives seriously contend that their rights under the Voting Rights Act are curtailed by the California Supreme Court plan, the redistricting process was free of racial taint. The majority's opinion, however, admits of no distinctions for cases where illicit discrimination is suspected. What is procedurally comfortable in this case might not ride so well when a court is confronted with evidence of racial gerrymandering or a long history of abusive voting practices.

Second, even if this panel believes that racial barriers to universal suffrage are no longer sufficiently prevalent to demand federal judicial supervision, it is not the place of judges to declare the goals of the Civil Rights and Voting Rights Acts accomplished and suspend statutorily-enacted jurisdictional provisions. The majority's holding is not predicated on any indication that Congress wishes to decrease the role of the federal courts in adjudicating voting rights issues. Nor does the majority cite any legislation or congressional statements suggesting that a dismissal in favor of a state court proceeding is any more appropriate today than it would have been in the 1960s. Absent specific direction from Congress, federal courts should not close their doors to plaintiffs seeking a federal forum in which to litigate their Voting Rights Act and constitutional challenges to a redistricting scheme.

Third, the availability of certiorari review in the Supreme Court is no substitute for litigating a voting rights dispute in federal court in the first instance. On certiorari review, the Supreme Court accepts the factual findings made by the state court. *General Trading Co. v. State Tax Comm'n*, 322 U.S. 335, 337, 64 S.Ct. 1028, 1029, 88 L.Ed. 1309 (1944). Not infrequently, these factual findings will preor-

dain the resolution of the constitutional and Voting Rights Act arguments raised by plaintiffs. Once the facts are found, it is too late, on certiorari review, to unshuffle the deck:

> Limiting the litigant to review here [in the Supreme Court] would deny him the benefit of a federal trial court's role in constructing a record and making fact findings. How the facts are found will often dictate the decision of federal claims. "It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues."

*England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 416–17, 84 S.Ct. 461, 465–66, 11 L.Ed.2d 440 (1964) (quoting *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963)).

The adequacy of the state court proceeding is further called into doubt when, as here, the state court acted in a quasi-legislative capacity and itself drew the redistricting lines. The California Supreme Court sat as both the drafter and the reviewer of the redistricting plan. *Younger* abstention and dismissal thus means that, unless the Supreme Court grants certiorari, the plaintiffs' federal constitutional and Voting Rights Act claims will never be subjected to independent review by adjudicators uninvolved in the redistricting process. The majority cites no cases, nor have I found any, supporting the application of *Younger* abstention to an unreviewed, quasi-legislative state court proceeding such as this.

Moreover, the quasi-legislative California Supreme Court proceeding produced no express findings of fact or conclusions of law responding to the plaintiffs' contentions. Parties, and perhaps the United States Supreme Court on certiorari review, are left to infer factual and legal rulings from the California Supreme Court's argumentation in support of its own plan. This court's abstention thus means that precious voting rights claims may be dismissed outright by federal courts even when those claims have been subject to only a truncated and indirect adjudication by the state forum.

For instance, as a consequence of this court's decision to abstain, these plaintiffs are left with no practicable opportunity to litigate their very serious claims of minority vote dilution and unjustified population deviations. That the district lines at issue were not drawn in bad faith or with obvious racial motivations does not make these claims any less deserving of federal court attention or any less critical to achieving the Constitution's goal of one person—one vote.

In sum, while the majority's decision to abstain may appear to be an efficient and diplomatic disposition of this case, the repercussions of its analysis are ominous. Although I do not doubt the ability of many state courts fairly to adjudicate federal voting rights claims, neither can I close my eyes to the continuing reality of racism and racial gerrymandering in voting practices in general, and in the redistricting and reapportionment processes in particular. The time has not yet come for federal courts to surrender their jurisdiction over voting rights challenges to state courts. Moreover, the determination of when the goals of the Civil Rights and Voting Rights Acts have been accomplished and when the safety net of a federal judicial forum is no longer necessary should rest with Congress, not with judges. I would exercise the jurisdiction granted this court by Congress and afford the plaintiffs a federal forum for litigation of their constitutional and Voting Rights Act claims. I therefore dissent.