Sebastian **BENAVIDEZ**; Enrique Reyes, Jr.; Shirley Castillo; Dolores Marques; Jose C. Casio; Thomas Requejo; Esther Estrada; Jose Armando Villejas; Martin Gutieruiz; Tony De La Rosa; Carmen De La Rosa; Luis Hernandez, Plaintiffs–Intervenors–Appellants,

and

Members of the California Democratic Congressional Delegation, Plaintiffs,

v.

March Fong **EU**, Secretary of State for the State of California; Assembly of the State of California; Senate of the State of California; Pete Wilson, Governor of the State of California, Defendants–Appellees.

No. 92–16260.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 15, 1993.

Decided Sept. 1, 1994.

---

Manuel Romero, Denise M. Hulett, Mexican American Legal Defense and Educ. Fund, San Francisco, CA, for plaintiffs-intervenors-appellants.

Manuel M. Medeiros, Deputy Atty. Gen., Oliver S. Cox, Staff Counsel, Sacramento, CA, for defendants-appellees.

Gailon W. McGowen, Jr., NAACP Legal Defense and Education Fund, Inc., New York City, for amicus.

Before: POOLE, BEEZER and KLEINFELD, Circuit Judges.

POOLE, Circuit Judge:

A group of Latino California residents appeal the three-judge district court's dismissal of their complaint in intervention alleging that California's congressional districting vio-

lates the Voting Rights Act, 42 U.S.C. § 1973 *et seq.* The district court's opinion articulates no reason for dismissing these plaintiff-intervenors. Appellee Governor Pete Wilson suggests that dismissal was proper either under principles governing jurisdiction over intervenors, or based on abstention. We consider and reject each of these possibilities. Because we can discern no proper basis for the dismissal, we reverse and remand for further proceedings.

## I

The California Constitution requires the state legislature to redistrict "[i]n the year following the year in which the national census is taken." Cal. Const. art. XXI, § 1. This provision thus mandated a redistricting in 1991, but as of September 1, 1991, no redistricting had been attempted. On September 6, 1991, Governor Pete Wilson filed a petition for original writ with the California Supreme Court, requesting that the Supreme Court proceed with redistricting. On September 23, the Legislature submitted three redistricting plans to the Governor, but he vetoed each one. On September 25, acknowledging the impasse, the California Supreme Court issued a writ of mandate and appointed special masters to proceed with drafting redistricting plans. *Wilson v. Eu,* 54 Cal.3d 471, 286 Cal.Rptr. 280, 816 P.2d 1306 (1991) (*Wilson I*).

The Masters proceeded to hold hearings in four cities. At these hearings, they received oral and written presentations from a wide variety of organizations and individuals, as well as 22 proposed plans. *Wilson v. Eu,* 1 Cal.4th 707, 742, 4 Cal.Rptr.2d 379, 395, 823 P.2d 545 (1992) (*Wilson III* ).[1] The Masters were instructed to consider the Voting Rights Act implications of their proposals. *Wilson I,* 54 Cal.3d at 473, 286 Cal.Rptr. at 281, 816 P.2d at 1307. However, no additional parties were permitted to intervene. *Id.* at 474, 286 Cal.Rptr. at 281, 816 P.2d at 1307. The appellants in this case did not participate in the Special Master process, although their

---

1. The California Supreme Court also issued a *Wilson II* decision, *Wilson v. Eu,* 54 Cal.3d 546, 286 Cal.Rptr. 625, 817 P.2d 890 (1991), dealing largely with procedural issues, but *Wilson II* is not germane to our decision.

attorneys, the Mexican American Legal Defense and Education Fund ("MALDEF"), filed an amicus brief, submitted plans, and made one hour of oral argument at one of the Special Master hearings.

The Special Masters presented their report to the California Supreme Court on November 29, 1991. In it, they rejected the 22 plans submitted to them and adopted an entirely new redistricting plan. The Supreme Court held an additional hearing on January 13, 1992. Appellants did not participate, but MALDEF filed an amicus brief and made a 20-minute oral argument. The Supreme Court subsequently approved the Special Masters' plan with only minor modifications on January 27, 1992. *Wilson III,* 1 Cal.4th at 729, 4 Cal.Rptr.2d at 393, 823 P.2d at 559.

On September 30, 1991, after Governor Wilson had filed suit in state court, members of the California Congressional Delegation filed suit in federal court. *Members of the California Democratic Congressional Delegation v. Eu,* 790 F.Supp. 925, 928 (N.D.Cal. 1992) [hereinafter *Congressional Delegation* ]. In their suit, they sought to prevent further congressional elections pursuant to the existing districting and to obtain from the federal courts a remedial redistricting order. Because the complaint challenged the existing apportionment on federal constitutional grounds, a three-judge district court was convened. *See* 28 U.S.C. § 2284(a). On October 8, defendant Governor Wilson filed a motion to dismiss for lack of subject-matter jurisdiction. The district court elected to withhold any decisions until after the California Supreme Court had acted. On December 18, the original plaintiffs in the district court proceedings filed a motion for a preliminary injunction against use of the special masters' proposed redistricting plan.

At this point, the appellant group of Latino California residents filed a motion to inter-

vene and a complaint in intervention. Their complaint alleged that all of the redistricting plans under consideration by the California Supreme Court or by the legislature violated the 1965 Voting Rights Act, 42 U.S.C. § 1973 *et seq.* They alleged further that redistricting based on 1990 census data violated the Voting Rights Act and the Equal Protection Clause because the failure to account for the undercounting of minority populations contravened the "one person, one vote" principle. Appellants' motion to intervene was granted orally on January 21, 1992, at a hearing on the defendant Governor's motion to dismiss. The district court limited intervention to challenges to California's congressional districts, refusing to allow intervention as to state legislature and assembly redistricting or the undercounting claims.

On January 28, one day after the state Supreme Court adopted its redistricting plan, the district court dismissed the entire action pending before it. Its subsequently-issued opinion based dismissal on *Younger* abstention grounds. *Congressional Delegation,* 790 F.Supp. at 930; *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). However, the opinion failed to identify the basis for dismissal of the complaint in intervention. Nor did the subsequent order denying the intervenors' motion for reconsideration identify the basis for dismissal. The intervenors have appealed. On appeal, we are faced with the question of whether that dismissal was proper.[2]

## II

As a preliminary matter, we must determine whether we have jurisdiction to decide this appeal. We conclude that we do.

█ Governor Wilson contests jurisdiction, arguing that 28 U.S.C. § 1253 requires appeal to the Supreme Court, not the Court of Appeals.[3] Section 1253 does generally per-

---

2. On appeal, the NAACP Legal Defense and Education Fund, Inc. moved for leave to file its amicus brief. That motion is granted.

3. 28 U.S.C. § 1253 provides:
 Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and

hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges.

mit appeal from three-judge district court denials of injunctions directly to the Supreme Court. However, *MTM, Inc. v. Baxley*, 420 U.S. 799, 95 S.Ct. 1278, 43 L.Ed.2d 636 (1975), controls this case. In *MTM*, the Supreme Court carved out an exception to § 1253, ruling that when an injunction was denied not on the merits but on the basis of *Younger* abstention, it had no jurisdiction and direct appeal must be taken in the Court of Appeals. *Id.* at 804, 95 S.Ct. at 1281. Governor Wilson correctly notes that *MTM*'s continuing validity following the repeal of 28 U.S.C. §§ 2281 and 2282 has been questioned. *See, e.g.,* 17 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4040, at 152–54. But *MTM* has not been overruled, and we are therefore required to find that we have jurisdiction in this *Younger* abstention case.

### III

We turn to the merits.

### A

Governor Wilson suggests several procedural grounds which might justify the dismissal of the appellants from this case. We consider each in turn.

■ Wilson argues first that because the district court dismissed the original plaintiffs, it had no jurisdiction over the case and could not properly allow the appellants to intervene. We disagree. The plaintiffs' case was dismissed on *Younger* grounds. *Younger* abstention is *not* jurisdictional, but reflects a court's prudential decision not to exercise jurisdiction which it in fact possesses:

Before proceeding to the merits of the [*Burford v. Sun Oil Co.*, 319 U.S. 315, 63

S.Ct. 1098, 87 L.Ed. 1424 (1943) and *Younger*] abstention issues, it bears emphasis that [defendant] does not dispute the District Court's *jurisdiction* to decide [plaintiff's] claim. Our cases have long supported the proposition that federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred.... Underlying these assertions is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds. *Kline v. Burke Construction Co.*, 260 U.S. 226, 234, 43 S.Ct. 79, 83, 67 L.Ed. 226 (1922).

That principle does not eliminate, however, and the categorical assertions based upon it do not call into question, the federal courts' discretion in determining whether to grant certain types of relief—a discretion that was part of the common-law background against which the statutes conferring jurisdiction were enacted.

*New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 358–59, 109 S.Ct. 2506, 2513, 105 L.Ed.2d 298 (1989) (emphasis in original).

■ Here, the district court granted permissive intervention on January 21, 1992, prior to its dismissal of the case. The subsequent discretionary decision not to consider the Congressional Delegation's claims for injunctive relief does not alter the fact that prior to dismissal, the district court had the power to consider those claims. Thus, at the time it granted intervention, the district court had subject-matter jurisdiction. Every authority the governor has cited involved a jurisdictional defect in the original plaintiff's case that consequently rendered intervention problematic or impossible.[4] There was no

---

**4.** *See United States ex rel. Texas Portland Cement Co. v. McCord*, 233 U.S. 157, 163–64, 34 S.Ct. 550, 553, 58 L.Ed. 893 (1914) (no intervention possible because original plaintiffs sued prematurely and therefore had no federal cause of action); *Simmons v. I.C.C.*, 716 F.2d 40, 46 (D.C.Cir.1983) (no intervention possible because neither original plaintiffs nor intervenors conferred subject-matter jurisdiction); *Fuller v. Volk*, 351 F.2d 323, 328–29 (3d Cir.1965) (district court could permit intervenor to continue action, even though original plaintiffs failed to demonstrate subject-matter jurisdiction, if intervenor

could establish separate subject-matter jurisdiction); *Kendrick v. Kendrick*, 16 F.2d 744, 745 (5th Cir.1926), *cert. denied*, 273 U.S. 758, 47 S.Ct. 472, 71 L.Ed. 877 (1927) (intervention impermissible where intervenors were indispensable parties as to issues raised and joinder would destroy diversity subject-matter jurisdiction); *I.C.C. v. Southern Ry. Co.*, 380 F.Supp. 386, 394–95 (M.D.Ga.1974), *aff'd in relevant part*, 543 F.2d 534 (5th Cir.1976) (no intervention possible because original plaintiff had no statutory authority

jurisdictional defect here. The governor's argument fails.

■ In the alternative, Wilson argues that once the original plaintiffs were dismissed, the intervenors had no interest left in the suit, because their only interest in intervention was to ensure that, should the district court fashion a remedy, that remedy would comport with the Voting Rights Act. This argument mischaracterizes the intervenors' claims. In part, the complaint challenges the validity of the Special Masters' proposed redistricting plan under the Voting Rights Act. This plan was adopted with only minor revisions by the California Supreme Court. *See Wilson III*, 1 Cal.4th at 729, 4 Cal.Rptr.2d at 393, 823 P.2d at 559. Thus, intervenors still have a cognizable interest in contesting the validity of that plan. This is so whether or not the original plaintiffs remain, and it is so whether or not the state court proceedings are still ongoing.

### B

■ Governor Wilson's arguments challenge only the district court's jurisdiction to grant permissive intervention. They do not expressly raise the question whether the district court, if it did have jurisdiction to grant permissive intervention, could still maintain jurisdiction over the intervenor's complaint once it dismissed the original plaintiffs' case. However, we have an obligation to raise sua sponte issues concerning subject-matter jurisdiction, whether it be ours or the district court's that is in doubt. *McGuckin v. Smith*, 974 F.2d 1050, 1052 (9th Cir.1992) (questioning appellate jurisdiction sua sponte); *Office & Professional Employees v. Laborers Funds Admin. Office*, 783 F.2d 919, 921–22 (9th Cir.1986) (questioning district court jurisdiction sua sponte). We must therefore resolve this issue.

■ Approximately half the other circuits have addressed the question, and all have reached the same conclusion. "The weight of authority in the United States Court of Appeals supports the principle that an intervenor can continue to litigate after dismissal of the party who originated the action." *Unit-

ed States Steel Corp. v. E.P.A.*, 614 F.2d 843, 845 (3d Cir.1979); *see also Arkoma Assoc. v. Carden*, 904 F.2d 5, 7 (5th Cir.1990); *Horn v. Eltra Corp.*, 686 F.2d 439, 440 (6th Cir.1982); *Miller & Miller Auctioneers, Inc. v. G.W. Murphy Indus., Inc.*, 472 F.2d 893, 895 (10th Cir.1973); *Atkins v. State Bd. of Educ.*, 418 F.2d 874 (4th Cir.1969); *cf. Aeronautical Radio, Inc. v. F.C.C.*, 983 F.2d 275, 283 (D.C.Cir.1993).

In setting standards for determining when an intervening party may continue to litigate after the original party has been dismissed, most circuits have adopted the approach of *Fuller v. Volk*, 351 F.2d 323, 328–29 (3d Cir.1965):

> [A] court has discretion to treat the pleading of an intervenor as a separate action in order that it might adjudicate the claims raised by the intervenor. *This discretionary procedure is properly utilized in a case in which it appears that the intervenor has a separate and independent basis for jurisdiction and in which failure to adjudicate the claim will result only in unnecessary delay.* By allowing the suit to continue with respect to the intervening party, the court can avoid the senseless 'delay and expense of a new suit, which at long last will merely bring the parties to the point where they now are.'

(citation omitted) (quoting *Hackner v. Guaranty Trust Co.*, 117 F.2d 95, 98 (2d Cir.1941) (emphasis added)); *accord Arkoma*, 904 F.2d at 7; *Miller & Miller Auctioneers, Inc.*, 472 F.2d at 896; *Atkins*, 418 F.2d at 876.

This approach, permitting the intervenor to continue when 1) an independent basis for jurisdiction exists, and 2) unnecessary delay would otherwise result, is sensible and consistent with our existing precedent. As to the first element of the test, we have previously held that a permissive intervenor must establish an independent basis for jurisdiction. *E.E.O.C. v. Nevada Resort Ass'n*, 792 F.2d 882, 886 (9th Cir.1986). The second element of the test asks whether refusing to allow the intervenors to continue would lead to senseless delay, because a new suit would inevitably bring the parties, at a much later

to sue and therefore could not establish subject- matter jurisdiction).

date, to the point where they are now. The rule promotes judicial economy and preserves litigant resources, and we adopt it.

### C

The question remains whether dismissal was proper under this test. Considering the procedural record, we conclude that the intervenors can demonstrate both an independent basis for jurisdiction and that unnecessary delay would result from refusing to allow them to continue.

■ The complaint in intervention asserts causes of action under 42 U.S.C. § 1973, and thus subject-matter jurisdiction exists pursuant to 28 U.S.C. § 1331. The intervenors can also show unnecessary delay. They were before a court which was familiar with the case and had already heard some oral argument relating to the ultimate merits. To dismiss the complaint and require them to start over would create precisely the sort of pointless delay the *Fuller* rule was designed to avoid. Indeed, the case *Fuller* relied on for its discussion of the importance of avoiding senseless delay, *Hackner,* had not gone past the pleading stage. *Hackner,* 117 F.2d at 97; *see also McKay v. Heyison,* 614 F.2d 899 (3d Cir.1980) (remanding for reconsideration of intervention when case had only gone as far as denial of class certification); *Atkins v. State Bd. of Educ.,* 418 F.2d 874 (4th Cir.1969) (remanding to allow individual who had not even intervened yet to do so in case dismissed because original plaintiff lacked standing). Therefore, if the district court's dismissal of the Latino residents' complaint was based on intervention principles, it erred.

### IV

### A

In the alternative, Governor Wilson contends that the district court could have based its dismissal on *Younger* abstention, just as it dismissed the original plaintiffs pursuant to *Younger. See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). We review de novo a decision to abstain based on the *Younger* doctrine. *Kenneally v. Lungren,* 967 F.2d 329, 331 (9th Cir.1992).

■ *Younger* abstention recognizes the interest in federal-state comity and the limited role courts of equity have. *Younger,* 401 U.S at 44–45, 91 S.Ct. at 750–51. It may apply to civil proceedings. *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 14 & n. 12, 107 S.Ct. 1519, 1528 n. 12, 95 L.Ed.2d 1 (1987); *Fresh Int'l Corp. v. Agricultural Labor Bd.,* 805 F.2d 1353, 1356–57 (9th Cir.1986). *Younger* abstention is appropriate when: 1) there is an ongoing state judicial proceeding, 2) the proceeding implicates important state interests, and 3) the proceeding offers an adequate opportunity to raise constitutional issues. *Middlesex Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982); *Partington v. Gedan,* 880 F.2d 116, 121 (9th Cir.1989); *Beltran v. California,* 871 F.2d 777, 781 (9th Cir.1988). However, the "task in [potential abstention] cases ... is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications' that can suffice ... to justify the *surrender* of that jurisdiction." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25–26, 103 S.Ct. 927, 942, 74 L.Ed.2d 765 (1983).

■ In light of these principles, the application of *Younger* to the intervenors was incorrect. *Younger* requires that "in the course of [the ongoing state proceedings] the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim." *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986). This intervenors did not have. They were not parties in the state proceeding. Nor could they have become parties; the California Supreme Court peremptorily denied all applications for intervention. They filed no briefs. Aside from a five-minute presentation by one of the plaintiff-intervenors at one of the Special Masters' hearings, they made no oral argument. They simply had no opportunity to litigate their claims, never mind a "full and fair" opportunity.

Governor Wilson contends that because the intervenors' attorney, MALDEF, filed several amicus briefs with the California Supreme Court and special masters and also made a limited oral argument, the intervenors have had a full and fair opportunity to litigate their claims. This argument cannot be taken seriously. Wilson cites no cases, and we can find none, in which any court has ever granted *Younger* abstention because a party's *attorney* was also participating in a state proceeding. To the contrary, *Younger*'s scope is closely circumscribed to parties actually involved in state litigation; even the presence of co-plaintiffs representing identical interests in state proceedings does not extend *Younger* to parties not actually involved in those proceedings. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 927–29, 95 S.Ct. 2561, 2565–67, 45 L.Ed.2d 648 (1975). But even if the intervening party were viewed as MALDEF, and not the individual litigants, Wilson has cited no cases, and we can find none, in which any court has ever granted *Younger* abstention because a state proceeding was ongoing in which the federal party was, not a party, but an amicus.

The *Younger* test is phrased in the conjunctive. See *Middlesex Ethics Comm.*, 457 U.S. at 432, 102 S.Ct. at 2521; *Beltran*, 871 F.2d at 781. All three elements of *Younger* must be present in order for abstention to be appropriate. Because the intervenors never had an opportunity to litigate their claims in the state proceeding,[5] the dismissal of their claims cannot be based on *Younger* abstention.

### B

As the district court acknowledged, "Abstention in voting rights cases requires further 'special consideration' and solicitude for the federal rights involved." *Congressional Delegation*, 790 F.Supp. at 930 (quoting *Badham v. United States Dist. Court*, 721 F.2d 1170, 1172 (9th Cir.1983)). Our consideration of abstention principles in the special context of voting rights cases confirms our conclusion that the district court erred if it dismissed the intervenors based on abstention.

"Abstention" embodies not a single principle, but a class of doctrines, numbering anywhere from two to four. See *Ohio Bureau of Employment Servs. v. Hodory*, 431 U.S. 471, 477, 97 S.Ct. 1898, 1902–03, 52 L.Ed.2d 513 (1977); *Law Enforcement Ins. Co. v. Corcoran*, 807 F.2d 38, 40 (2d Cir.1986), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987). Two abstention doctrines besides *Younger* abstention are potentially at issue in this case: *Pullman* abstention, which applies when state resolution of state law issues may materially affect or obviate the need for a federal constitutional decision, and *Germano* abstention, a subset of *Pullman* abstention, which applies when state redistricting may obviate the need for a federal determination of the propriety of state districting. See *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Scott v. Germano*, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965).

The number of abstention categories is of no importance, so long as courts keep straight the procedural attributes that go with each particular abstention doctrine. As the Supreme Court has reemphasized in its most recent voting rights abstention case,

We have referred to the *Pullman* doctrine as a form of "abstention," see 312 U.S., at 501–502, 61 S.Ct., at 645–46. To bring out more clearly, however, *the distinction between those circumstances that require dismissal of a suit and those that require postponing consideration of its merits*, it would be preferable to speak of *Pullman* "deferral." *Pullman* deferral recognizes that federal courts should not prematurely resolve the constitutionality of a state statute, just as *Germano* deferral recognizes that federal courts should not prematurely involve themselves in redistricting.

*Growe v. Emison*, —— U.S. ——, ——, 113 S.Ct. 1075, 1080 n. 1, 122 L.Ed.2d 388 (1993) (emphasis added).

Our careful review of prior uses of the abstention doctrine in voting rights cases indicates that each prior use involved *Pullman* or *Germano* abstention, "deferral abstentions," rather than *Younger* abstention, a

---

**5.** Given this conclusion, we need not consider whether 1) the proceeding before the California Supreme Court constituted an "ongoing judicial proceeding" or was in fact legislative in nature, or whether 2) the state's interests were sufficiently weighty to invoke *Younger*.

"dismissal abstention." For example, the leading voting rights abstention case, *Scott v. Germano*, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965), develops a species of *Pullman* abstention. In *Germano*, the Supreme Court directed the district court to abstain to allow the Illinois state courts an opportunity to fashion a constitutional redistricting plan. However, it also specifically instructed the district court to *retain* jurisdiction, and in the event that the state failed to timely adopt a valid plan, to go forward with such remedial steps as were necessary. *Id.* at 409–10, 85 S.Ct. at 1527. The abstention involved was clearly a deferral abstention.

Subsequent cases have followed this same route. *See Growe v. Emison*, — U.S. —, —– – —–, 113 S.Ct. 1075, 1081–83, 122 L.Ed.2d 388 (1993) (reversing the district court's failure to abstain under *Germano* while indicating it would have retained jurisdiction); *Badham v. United States Dist. Court*, 721 F.2d 1170, 1171 (9th Cir.1983) (retaining jurisdiction while abstaining under *Pullman*); *Romero v. Coldwell*, 455 F.2d 1163, 1165–67 (5th Cir.1972) (abstaining under *Pullman*[6]); *Bianchi v. Griffing*, 393 F.2d 457, 461 (2d Cir.1968) (retaining jurisdiction while abstaining under *Germano*); *Avens v. Wright*, 320 F.Supp. 677, 686 (W.D.Va.1970) (retaining jurisdiction while abstaining under *Germano*); *Mahoney v. Burkhardt*, 299 F.Supp. 787, 789–90 (D.N.J. 1969) (denying preliminary injunction under *Germano* without dismissing case).[7]

 Thus, Governor Wilson has no precedent to support the proposition that a federal court should apply a dismissal abstention when faced with a voting rights challenge. The application of such abstentions is indeed contrary to the federal courts' traditional role in safeguarding voting rights. *See Congressional Delegation*, 790 F.Supp. at

935–36 (Tang, J., dissenting). We do well to remember that abstention "should be applied in only the most extraordinary circumstances when fundamental rights such as voting rights are involved." *O'Hair v. White*, 675 F.2d 680, 694 (5th Cir.1982) (en banc); *see also Badham*, 721 F.2d at 1173. While we cannot categorically conclude that dismissal abstention would never be appropriate in a voting rights case, the possibility should be approached by federal courts with considerably more suspicion than when determining whether to engage in deferral abstention.

### C

It is still possible the district court believed abstention from the Latino intervenors' claims was compelled by *Germano* and *Pullman* rather than *Younger*. Even so, as the preceding discussion makes clear, the procedure it elected to follow was improper. The district court stayed its hand while the state proceedings continued; this much would have been consistent with *Germano* abstention. Upon completion of the state proceedings, however, it dismissed the entire federal case, and in that regard it erred even under *Germano*, which does not authorize dismissal. *See Germano*, 381 U.S. at 409, 85 S.Ct. at 1527.

The Supreme Court has recently addressed the identical situation faced by us: an unseemly race in federal and state courts to adopt a state redistricting plan in response to the most recent census. *See Growe v. Emison*, — U.S. —, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). There, the district court failed to defer at all to the Minnesota state court, and in fact enjoined its proceedings. *Id.* at —, 113 S.Ct. at 1079. The Supreme Court promptly vacated the injunction, *Cotlow v. Emison*, — U.S. —, 112 S.Ct. 855, 116 L.Ed.2d 764 (1992), and subsequently reversed the failure to abstain. *Growe*, — U.S. at —, 113 S.Ct. at 1083.

---

**6.** The *Romero* court dismissed the case without prejudice rather than retaining jurisdiction only because under Texas law, the Texas state courts would not have been able to proceed absent a dismissal. *Romero*, 455 F.2d at 1166–67. This dismissal without prejudice is thus the procedural equivalent of *Pullman* deferral for Texas cases. *See Harris County Commissioners Court v. Moore*, 420 U.S. 77, 88 n. 14, 95 S.Ct. 870, 877 n. 14, 43 L.Ed.2d 32 (1975).

**7.** Both the District Court and Governor Wilson also rely on *Duncan v. Poythress*, 657 F.2d 691 (5th Cir.1981), *cert. dismissed*, 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982) as precedent for federal courts abstaining in voting rights cases, but in fact the *Duncan* court declined to abstain under *Pullman*, concluding that *"Pullman* abstention is simply inappropriate in the circumstances of this case." *Id.* at 699.

The district court in this case properly exercised more restraint, deferring to the ongoing redistricting proceedings. It simply went too far. As the Supreme Court explained in *Growe*, having stayed its hand until a state redistricting was adopted, the district court "was then empowered to entertain the *Emison* plaintiffs' claims relating to the legislative redistricting only to the extent those claims challenged the *state court's* plan." *Id.* at ——, 113 S.Ct. at 1082 (emphasis in the original). This the Latino intervenors' claims did. The district court should have entertained those claims.

## V

Having reviewed both abstention-based and intervention-based rationales for dismissing the intervenor's complaint, we can find no basis for the dismissal. Accordingly, the district court's dismissal of the plaintiff-intervenors' complaint is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

REVERSED and REMANDED.